545 A.2d 55

**Frederick M. EAGAN**

v.

**Clarissa AYD.**

**No. 176, Sept. Term, 1987.**

Court of Appeals of Maryland.

Aug. 4, 1988.

Charles E. Yankovich, Towson, for appellant.

Kenneth D. Man (Kroop, Kurland & Rosenberg, on brief), Baltimore, for appellee.

Argued before MURPHY, C.J., and ELDRIDGE, COLE, RODOWSKY, McAULIFFE, ADKINS and BLACKWELL, JJ.

ADKINS, Judge.

The defendant in a paternity action refused to submit to a blood test ordered by the Circuit Court for Harford County (Carr, J.) pursuant to Md.Code (1984) § 5–1029 of the Family Law Article. Judge Carr held that the refusal constituted contempt of court. The defendant now insists that the court lacked the power to hold him in contempt. We disagree and affirm the judgment of the circuit court.

There is no dispute about the factual framework of the question before us. Appellee, Clarissa Ayd, initiated a

paternity action in the Circuit Court for Harford County against appellant, Frederick M. Eagan, alleging that Eagan was the father of Ayd's minor daughter. With the complaint Ayd filed a § 5–1029 motion for a blood test. The court ordered Eagan to submit to the test. Eagan, nonetheless, failed to appear for the test, and eventually the court issued an order finding him in civil contempt of court for his failure to comply with the blood-test order. The contempt order further provided that "Frederick Eagan shall submit to a blood test within five days of the date of this Order to purge himself of his contempt ... [or] be committed to the jurisdiction of the Harford County Detention Center...." [1]

Eagan adamantly refused to take the blood test, and appealed the contempt order to the Court of Special Appeals. We granted certiorari on our own motion prior to decision by the intermediate appellate court.

Section 5–1029, the focus of controversy in this appeal, in pertinent part provides:

(a) On the motion of a party to the [paternity] proceeding or on its own motion, the court shall order the mother, child, and alleged father to submit to blood tests to determine whether the alleged father can be excluded as being the father of the child.

\* \* \* \* \* \*

(e)(1) The results of each blood test shall be received in evidence if:

(i) definite exclusion is established; or

(ii) the testing is sufficiently extensive to exclude 97.3% of alleged fathers who are not biological fathers, and the statistical probability of the alleged father's paternity is at least 97.3%.

\* \* \* \* \* \*

---

1. The contempt order was stayed pending the outcome of this appeal.

(f) If any individual fails to submit to a blood test ordered by the court, that refusal, properly introduced in evidence:

(1) shall be disclosed to the court and jury; and

(2) may be commented on by the court or by counsel.

Eagan's principal contention is that the sanctions available for failing to take the court-ordered blood test are limited by § 5–1029(f) to disclosure to the court and jury and comment by the court or by counsel. Ayd counters by asserting that "[§] 5–1029(f) . . . is not an attempt [by] . . . the legislature to limit the powers of the court to punish for contempt." Brief at 7. Alternatively, Ayd argues that the court has an inherent power to hold Eagan in contempt and one which the legislature has no power to limit.

In order to evaluate these arguments, we must ascertain the legislative intent of § 5–1029, and we must do so within the context of the paternity statute of which it is a part. Our primary task in this regard is to determine the legislative goal or purpose of the statutory provisions. *Kaczorowski v. City of Baltimore*, 309 Md. 505, 513, 525 A.2d 628, 632 (1987). *Kaczorowski* teaches that in this endeavor we are "not limited to the words of the statute [but] . . . may and often must consider other 'external manifestations' or 'persuasive evidence'. . . ." *Id.* at 514–515, 525 A.2d at 632. We begin this task by a brief historical review of the subject which is now designated "Paternity Proceedings," but which until 1963 was referred to under the heading of "Bastardy" or "Bastardy and Fornication."

According to one authority, "[p]roceedings for redress in cases of bastardy are wholly matter[s] of statutory regulation." L. Hochheimer, *The Law of Crimes and Criminal Procedure* § 271 (2d ed. 1904) [footnote omitted]. In Maryland, that regulation began at least as early as 1715. Under Ch. 27 of the Acts of that year, "Women who have Bastards, and do refuse to discover the Father or Begetter of such Children" could be punished by "Whipping upon . . . their bare Bodies, till the Blood do appear, [by] so many

Stripes not exceeding Thirty nine...." *The Laws of the Province of Maryland* 88–89 (Cushing facsimile ed. 1978). Chapter 13, Acts of 1781 established somewhat more elaborate procedures, but without the corporal punishment. The basic functioning of that law was for a woman who had allegedly borne an illegitimate child to be summonsed before a justice of the peace. She was then required to post security to indemnify the county for any cost of supporting the child, and if she did not post the security, she would be jailed. But if she named the father of the child, she was discharged. The putative father was then called before the justice and the father, in his turn, was required to post security. If aggrieved by that judgment, he was entitled to seek a jury trial in the county court, "as in other criminal cases." *Id.*

One purpose of these laws was, of course, to prevent the county from having to bear the full cost of supporting an illegitimate child. The other was to punish fornication, and the laws were deemed criminal in nature. *Bake v. State,* 21 Md. 422, 425–426 (1864); *Owens v. State,* 10 Md. 164, 168 (1856); *Oldham v. State,* 5 Gill 90, 93 (1847).[2] And the criminal bastardy laws still were in effect in 1941 when Article 12, § 17 of the code (the predecessor to § 5–1029) came into being. Overall, Article 12 bore considerable resemblance to the 1781 statute, but § 17 was an innovation.

The new section was enacted in order to give the court the benefit of a relatively new scientific tool—the use of blood tests to prove nonpaternity. Bowen, "Blood Tests and Disputed Parentage," 18 Md.L.Rev. 111, 115 (1958) (hereinafter Bowen). It provided:

---

**2.** We have equivocated a bit on the criminal nature of bastardy. *Compare, e.g., Kennard v. State,* 177 Md. 549, 553, 10 A.2d 710, 712 (1940) (technically not a criminal proceeding) with *Feige v. Boehm,* 210 Md. 352, 359, 123 A.2d 316, 321 (1956) (treated as criminal although civil in purpose) and the nineteenth century cases cited in the text to which this note is appended.

Whenever the defendant in bastardy proceedings denies that he is the father of the child, *upon the petition of the defendant,* the court shall order that the complainant, her child and the defendant submit to such blood tests as may be deemed necessary to determine whether or not the defendant can be *excluded* as being the father of the child. *The result of the test shall be received in evidence, but only in case definite exclusion is established.... If the complainant or her child fail to submit to the blood tests ordered by the court to be taken, such fact, when properly adduced by evidence, shall be disclosed to the court and jury, and may be commented upon by the court or by counsel to the jury or to the court when sitting as a jury* [emphasis supplied].

This new addition was patently for the benefit of the defendant. *Shanks v. State,* 185 Md. 437, 449, 45 A.2d 85, 90 (1945); Bowen, 18 Md.L.Rev. at 116–117. The new law made no mention of contempt as a sanction for failure to take the test, but it is obvious that the defendant would be a most unlikely subject for that sanction, since he was the one who would request the test, and since the test could not be placed in evidence if its results were adverse to him. It is true, nevertheless, that there was likewise no mention of the use of contempt against a mother who disobeyed the court's order. The only sanctions mentioned were disclosure of the failure to be tested to the jury, and comment on that failure. This is true despite the fact that only two years earlier the General Assembly had enacted Article 12, §§ 5 and 6, which authorized the State's Attorney to procure the attendance of anyone except the defendant for investigation of bastardy charges and which allowed that officer to enforce obedience to his commands by seeking a contempt order in court. 1939 Md.Laws, Ch. 182 at 301. These provisions are now in § 5–1019 of the Family Law

Article.[3]

Putting aside insubstantial amendments, the next major change came via Ch. 722, Acts of 1963. This law among other things repealed Article 12, "Bastardy and Fornication," for the purpose of "entirely revising the laws of this State concerning bastardy and fornication and paternity proceedings; vesting in the several equity courts of this State jurisdiction to hear and determine all such paternity proceedings; [and] providing generally for such jurisdiction and the procedure for its exercise...." 1963 Md.Laws, Ch. 722.

By this Act, criminal "Bastardy" became civil "Paternity." Despite that change, however, the new law carried forward many of the substantive provisions of old Article 12. The power of the State's Attorney to enforce his investigatory authority through contempt (except as to the defendant) was retained in Article 16, § 66D. And old Article 12, § 17 became, with only one minor change, Article 16, § 66G.[4] But some other more significant statutory changes were made. A provision was added to the effect that the defendant was not required to answer the complaint against him (§ 66E(f)—now § 5–1012 of the Family Law Article). The defendant could not be compelled to testify (§ 66F(b)—now § 5–1028(d) of the Family Law Article). No comment could be made on the defendant's failure

---

3. Eagan asserts that because § 5–1019 explicitly provides for sanctions by way of contempt, the omission of such a provision from § 5–1029 manifests a legislative purpose to deny that remedy for refusal to take a blood test. We are not persuaded. A State's Attorney has no inherent power to enforce his or her demands by finding people in contempt. Section 5–1019(c) and its statutory parents simply supply a mechanism to supply that lack. No similar authority is required with respect to orders issued by a court, because of a court's inherent contempt power. See Dorsey v. State, 295 Md. 217, 227–228, 454 A.2d 353, 359 (1983). In view of that fact, Eagan's contrast between § 5–1019 and § 5–1029 is of no particular significance.

4. While old Article 12, § 17 allowed the court to order a blood test only at the defendant's request, new Article 16, § 66G provided that the court could order the test on its own motion as well.

to testify (§ 66F(d)—now § 5–1027(c) of the Family Law Article). We shall analyze these statutory protections for the defendant shortly. For now, we need note only that the apparent pro-male tilt they seem to suggest (a slant quite consistent with the early history of paternity laws) is belied by the basic goals of the 1963 legislation.

The Commission to Study Problems of Illegitimacy among the Recipients of Public Welfare Monies in the Program for Aid to Dependent Children (hereinafter the Commission) concerned itself with bettering the plight of the illegitimate child, and the 1963 statute was the Commission's legitimate offspring. *See* Final Report of the Commission on the Problems of Illegitimacy 12–14 (6 December 1961) (hereinafter Commission Report). The Commission's recommendations were made with that concern in mind and "with the hope that if adopted, illegitimacy will be curtailed and amelioration of the effects of illegitimacy on children and the community at large will result." Commission Report at 22.

The Commission considered the then-existing criminal bastardy laws inadequate because in its view

> *not only do many men now escape any responsibility for the maintenance of their illegitimate children,* but the present law is also inadequate from the Commission's viewpoint because it neither makes provision for inquiry into the child's custody and welfare, nor provides for a determination of the mother's obligation to support.

*Id.* [emphasis supplied]. It saw the criminal laws as an impediment to holding men responsible for the maintenance of their illegitimate children:

> To establish paternity and provide for the child's support, the state must "beyond a reasonable doubt," prove the man's "guilt"; and in so doing it is restricted by technicalities of the criminal law as to time limitations, situs of the act of fornication, and inadmissibility of a married woman's testimony as to any bastard born to her.

*Id.* Thus, a major goal of the 1963 legislation was to remove some of the legal impediments to establishing paternity.

In 1976 the General Assembly took further action to enhance effective recovery of child support payments. Chapter 778 of the Acts of that year, entitled "Children— Support Enforcement," enacted comprehensive provisions looking to that end. Among them was an amendment to Article 16, § 66G that allowed, for the first time, the sanctions for failure to take a blood test to be applied to the defendant in a paternity action. *See* 1976 Md.Laws, Ch. 778 at 2155. This small change included in a major bill dealing with creation of the Division of Child Support Enforcement was followed by much more significant legislation in 1982.

Improvements in blood-testing technology had produced the Human Leukocyte Antigens (HLA) test. Its proponents contended that this test could do more than merely exclude a given defendant as a putative father. The legislature, in apparent agreement, responded by enacting Ch. 784, Acts of 1982. *Haines v. Shanholtz,* 57 Md.App. 92, 95–96, 468 A.2d 1365, 1366, *cert. denied,* 300 Md. 90, 475 A.2d 1201 (1984). It amended Art. 16, § 66G to essentially the present form of § 5–1029.[5] Now, any party may request a blood test (subsection (a)). Moreover, the test is admissible not only if it excludes the defendant as father, but also "if ... the testing is sufficiently extensive to exclude 97.3% of alleged fathers who are not biological fathers, and the statistical probability of the alleged father's paternity is at least 97.3%" (subsection (e)). By Ch. 551, Acts of 1984, the section was further amended to eliminate the court's discretion to reject a qualifying blood test. A test that meets the standards of subsection (e) *"shall* be received in evidence" [emphasis supplied]. But like the earlier blood test provisions, there is no mention of the use of contempt to enforce

---

**5.** The former Article 16 "Paternity" provisions were transferred to the Family Law Article by Ch. 296, Acts of 1984, without substantive change.

a blood-test order. And, what is now subsection (f) remains much the same as it has read since 1941.

Does this history force us to agree with Eagan that the legislature, by adoption of what is now subsection (f), intended that disclosure of refusal to take a test and comment on that failure are the only permitted sanctions for one who flouts a court order? We believe not.

We are aware that one scholar has written that the legislative provision for comment on failure to take a blood test "seems to imply that no further sanctions may be used." Bowen, 18 Md.L.Rev. at 147. *See also* "Survey of Developments in Maryland Law, 1983–1984," 44 Md.L.Rev. 254, 562–563 (1985) (hereinafter "Survey") ("[t]he implication of these provisions ... is that ... compulsory testing is not available in paternity proceedings"). But Mr. Bowen also suggested that the "inherent power" of a Maryland court "to enforce its orders ... might be upheld" in the context of a paternity blood test. 18 Md.L.Rev. at 117. And in 1958, when he wrote, the testing was available only at the defendant's behest. As we have explained, the legislature scarcely could have contemplated a contempt sanction for the defendant under those circumstances. As to the "Survey," the student authors provided no extensive reasoning or authority to support its conclusion.

We recognize, too, that in *Adams v. Mallory*, 308 Md. 453, 464, 466, 520 A.2d 371, 377, 378 (1987), we said that "[m]any of the [paternity] statute's provisions are designed to ensure that the alleged father is not compelled to present evidence" and that "the paternity statute embodies the principle that an alleged father may not be officially coerced to give evidence." But these statutory privileges in favor of the defendant were, as we have already observed, mostly added in 1963 when "Bastardy" was decriminalized. They reflect a legislative view favoring the putative father, but only to the extent of retaining for his benefit something akin to the privilege against self-incrimination that applied before the proceeding became a civil one.

Even in a criminal case, however, a compulsory blood test does not infringe upon the privilege against self-incrimination. *Schmerber v. California,* 384 U.S. 757, 760–765, 86 S.Ct. 1826, 1830–1833, 16 L.Ed.2d 908, 914–917 (1966); *Adams, supra,* 308 Md. at 465 n. 17, 520 A.2d at 377 n. 17; *Davis v. State,* 189 Md. 640, 644–646, 57 A.2d 289, 290–292 (1948). Moreover, evidence of refusal to take a blood test is not constitutionally barred in the criminal setting. *South Dakota v. Neville,* 459 U.S. 553, 103 S.Ct. 916, 74 L.Ed.2d 748 (1983). There is no reason to extend this legislative largesse to situations beyond its original scope.

And despite possible inferences that might be drawn from *Adams,* the goal of the paternity law is not to benefit putative fathers. We have identified the early view that one purpose was to lessen the burden on the public fisc. We have noted the 1963 emphasis on easing the task of holding men responsible for support of their illegitimate children, and the 1976 enlargement of effective procedures for child support recovery.[6] A more contemporary Maryland perspective, however, focuses on the 1982 amendments that followed the development of more accurate blood testing. One of the broader goals of those amendments "was to protect illegitimate children through court-ordered support based upon sophisticated and reliable genetic testing." *Haines v. Shanholtz,* 57 Md.App. at 96, 468 A.2d at 1367. A second but perhaps related goal of this legislation was to "assist [the State] in arriving at more pre-trial settlements" in paternity cases and thus curtailing the expenditure of "court time, prosecutor time and staff time...." Senate Judicial Proceedings Committee file on S.B. 21 and S.B. 105 (1982) (testimony of George Sinclair at p. 2). *Also see Haines,* 57 Md.App. at 96, 468 A.2d at 1367.

---

6. A sister state sees its version of the Uniform Act on Paternity §§ 1–18, 9B U.L.A. 350 (Master ed. 1987), as "designed to give the mother a remedy to compel the putative father to contribute to the support of his illegitimate child." *Perry v. Commonwealth ex rel. Kessinger,* 652 S.W.2d 655, 657 (Ky.1983).

Given these legislative goals and the fact that a test which complies with the conditions of § 5–1029(e) must be admitted into evidence, it seems fairly clear that the General Assembly did not intend to deprive the circuit courts of a vital means of procuring blood-test results—*i.e.*, the contempt power. This reading of the statute accords with the legislative concern for protection of both the child and the political subdivision. *See also* § 5–1002 of the Family Law Article.[7] It is consistent with the legislative abandonment of the blood test solely as a protection for the defendant. It fits the current provision that allows any party to insist on a test. And it sustains the general policy of the paternity law by tending to assure the production of reliable and important evidence. Moreover, as the "Survey" aptly states "[b]ecause the legal sufficiency of a case may depend upon the ability to present blood-test results, the capacity to compel an individual to submit to the tests is crucial." "Survey," *supra*, 44 Md.L.Rev. at 563.

We shall not assume that the General Assembly meant to subvert the general and beneficent purposes of the paternity law by curtailing, *sub silentio*, a court's power to enforce its orders and to advance the search for truth by invoking the sanction of contempt. Consequently, we hold that the

---

**7.** This section declares the legislative policy supporting the Paternity Subtitle thus:

§ 5–1002. Legislative Policy.

(a) The General Assembly finds that:

(1) this State has a duty to improve the deprived social and economic status of children born out of wedlock; and

(2) the policies and procedures in this subtitle are socially necessary and desirable.

(b) The purpose of this subtitle is:

(1) to promote the general welfare and best interests of children born out of wedlock by securing for them, as nearly as practicable, the same rights to support, care, and education as children born in wedlock;

(2) to impose on the mothers and fathers of children born out of wedlock the basic obligations and responsibilities of parenthood; and

(3) to simplify the procedures for determining paternity, custody, guardianship, and responsibility for the support of children born out of wedlock.

General Assembly did not mean to preclude the use of the contempt power to compel a reluctant defendant to submit to the test.[8]

Out-of-state authority provides support for our interpretation of § 5–1029. In *In re Paternity of D.A.A.P.*, 117 Wis.2d 120, 344 N.W.2d 200 (App.1983), the trial court found a paternity defendant in civil contempt for refusing to submit to a court-ordered blood test and consequently ordered him to "submit to the blood test or spend ten days in the county jail." *Id.* at 123, 344 N.W.2d at 202. On appeal the defendant challenged the contempt order claiming that the remedies set forth in Wis. Stat. Ann. § 767.47(3) (West 1981) (precluding the defendant from introducing evidence of the plaintiff's intercourse with a man other than himself until he "has undergone and made available to the court blood tests as provided in § 767.48") and § 767.48(4) (requiring disclosure to the fact-finder if any party "refuses to submit to the blood test") were exclusive remedies.

> The court rejected these contentions pointing out that while this court agrees with A.W.O. that statutes are to be construed and harmonized so as to give each full force and effect, ... we do not agree that the availability of the contempt power for refusing to submit to lawfully ordered blood testing necessarily renders the sanctions specified under secs. 767.47 (3) and 767.48 (4) superfluous. We construe and harmonize the contempt powers under ... these ... provisions by holding that the sanctions specified under secs. 767.47(3) and 767.48(4) are available in addition to a court's power to find a party in contempt.

> A court's power to hold in contempt, although inherent, is discretionary. Upon refusal of a party to submit to a court-ordered blood test, a court may in the exercise of its discretion hold the party in contempt; it may also decline

---

8. It is not unusual for the legislature to contemplate alternative methods for enforcing its enactments. *See, e.g., Goodyear Tire v. Ruby*, 312 Md. 413, 425, 540 A.2d 482, 488 (1988).

to do so. Regardless of the court's finding of contempt, the sanctions set out under secs. 767.47(3) and 757.48(4) ... continue to apply in the event that the putative father refuses to take the test.

*Id.* at 126–127, 344 N.W.2d at 203–204 [citations omitted].

What, then, of § 5–1029(f)? We restate its language:

(f) If any individual fails to submit to a blood test ordered by the court, that refusal, properly introduced in evidence:

(1) shall be disclosed to the court and jury; and

(2) may be commented on by the court or by counsel.

Does our decision leave this as meaningless surplusage? Not at all.

There may be circumstances when a blood test has been ordered, but when the sanction of contempt cannot be used for effective enforcement. For example, if the court orders a defendant to be tested, but the defendant thereafter disappears, an effort to impose contempt sanctions would be of no avail. And a defendant subject to a contempt order might nevertheless refuse to obey. Under either of these circumstances, subsection (f) could be invoked.

In other situations, a party might conclude not to seek the sanction of contempt against a recalcitrant opponent. Here again, subsection (f) would be available as "a not inconsequential sanction...." *Regiec v. Stogo*, 72 Md.App. 311, 313, 528 A.2d 545, 546 (1987). That the legislature has provided an alternative sanction does not, for the reasons we have given, deprive the court of its authority to enforce an order by use of the contempt power.[9] *See In re Paternity of D.A.A.P., supra*, 117 Wis.2d at 126–127, 344 N.W.2d at 203–204.

---

**9.** Nor does the fact that refusal to submit to the test might be admissible in evidence in a civil case, *see Nast v. Lockett*, 312 Md. 343, 368–369, 539 A.2d 1113, 1126 (1988), make it unreasonable for the legislature to make that result statutorily clear, in a statute that was originally applicable in a criminal proceeding.

Since we have held that the General Assembly did not intend to preclude the use of the contempt power to compel blood testing under § 5–1029, we need not decide whether the legislature could have prohibited the sanction of contempt under this section, had it wished to do so. There are certainly decisions that lend force to the argument that the contempt power is inherent in a court, and cannot be legislatively limited. *See, e.g., Baltimore Radio Show, Inc. v. State,* 193 Md. 300, 320–323, 67 A.2d 497, 506–507 (1949); *In Re Lee,* 170 Md. 43, 47, 183 A. 560, 562, *cert. denied,* 298 U.S. 680, 56 S.Ct. 947, 80 L.Ed. 1400 (1936); *Kelly v. Montebello Park Co.,* 141 Md. 194, 205, 118 A. 600, 604 (1922); *Ex Parte Maulsby,* 13 Md. 625, 635 (1859); *Pearson v. State,* 28 Md.App. 464, 479–480, 347 A.2d 239, 248–249 (1975).

But even if there is doubt as to the applicability of the inherent power principle to the type of constructive contempt that is involved in this case, it is proper to construe a statute in a way that does not "give rise to doubts as to its constitutionality...." *Heileman Brewing v. Stroh Brewery,* 308 Md. 746, 764, 521 A.2d 1225, 1234 (1987). That is what we have done here. *See also Davis v. State,* 312 Md. 172, 179, 539 A.2d 218, 221 (1988); *Yangming Transport v. Revon Products,* 311 Md. 496, 509, 536 A.2d 633, 640 (1988); *City of College Park v. Cotter,* 309 Md. 573, 589, 525 A.2d 1059, 1067 (1987); *In re Criminal Investigation No. 1–162,* 307 Md. 674, 685, 516 A.2d 976, 982 (1986). As in *Hitzelberger v. State,* 173 Md. 435, 438, 196 A. 288, 290 (1938), "[w]hether the Legislature has the power to limit, extend, or declare contempts" is a question we need not decide here.

JUDGMENT OF THE CIRCUIT COURT FOR HARFORD COUNTY AFFIRMED. APPELLANT TO PAY THE COSTS.

Dissenting opinion by ELDRIDGE, Judge, in which COLE and McAULIFFE, Judges, concur.

Under the majority opinion, whenever paternity defendants fail to submit to blood tests ordered under Maryland Code (1984), § 5–1029 of the Family Law Article, courts

may ignore the sole sanction expressly set forth in that statute, and may generally enforce their orders through the sanction of civil contempt. This approach contradicts well-established rules of statutory construction, disregards the General Assembly's long-standing policy favoring a person's freedom to resist coercive governmental intrusion into his or her body, and places undue emphasis on an erroneous view of the inherent power of contempt. Consequently, I dissent.

## I.

It is a well-established rule of statutory construction that the enumeration of one item ordinarily implies the exclusion of all others. *Office & Prof. Employees Int'l v. MTA,* 295 Md. 88, 96, 453 A.2d 1191, 1195 (1982); Sutherland, 2A *Statutory Construction* §§ 47.23, 47.24 (4th ed. 1984 rev.).[1] Thus, when a legislative body creates a statutory right and establishes a specific remedy for enforcing that right, the legislative remedy normally is exclusive. *See Johns v. Hodges,* 62 Md. 525, 538 (1884); Sutherland, *Statutory Construction, supra,* § 47.23. *See also Trust Co. v. Ward Baking Corp.,* 177 Md. 212, 220, 9 A.2d 228, 231 (1939).

In § 5–1029(f), the General Assembly provided only that a paternity defendant's failure to submit to a blood test "shall be disclosed to the court and jury" and "may be commented on by the court or by counsel." The Legislature enumerated no sanction other than this "negative inference." Therefore, the statutory sanction is generally exclusive, and

---

1. This rule is often expressed as the Latin maxim *"expressio unius est exclusio alterius," Office & Prof. Employees Int'l v. MTA, supra,* 295 Md. at 96, 453 A.2d at 1195. For Maryland cases employing this principle of statutory construction, *see, e.g., Montgomery v. State,* 292 Md. 155, 162–163, 438 A.2d 490, 493 (1981); *American Security v. New Amsterdam,* 246 Md. 36, 41, 227 A.2d 214, 216–217 (1967); *State Insurance v. Nationwide,* 241 Md. 108, 117, 215 A.2d 749, 754–755 (1966); *Gay Investment Co. v. Comi,* 230 Md. 433, 438, 187 A.2d 463, 466 (1963); *Railroad Co. v. Lichtenberg,* 176 Md. 383, 390, 4 A.2d 734, 737, *appeal dismissed,* 308 U.S. 525, 60 S.Ct. 297, 84 L.Ed. 444 (1939); *Graham v. Joyce,* 151 Md. 298, 308, 134 A. 332, 336 (1926); *Vanderford v. Farmers' Bank,* 105 Md. 164, 168, 66 A. 47, 49 (1907); *De Atley v. Senior,* 55 Md. 479, 483 (1881); *Thanhauser v. Savins,* 44 Md. 410, 414 (1876).

circuit courts ordinarily should not hold defendants in contempt for refusing to consent to a court-ordered blood test.

Had it intended that the contempt power be utilized under ordinary circumstances in cases like this, the General Assembly could easily have so provided. *See State Insurance v. Nationwide,* 241 Md. 108, 117, 215 A.2d 749, 754–755 (1966) ("Where a statute expressly provides for certain exclusions, others should not be slightly read therein by implication, for if the Legislature intends other exclusions it is so easy to add them ..."). Indeed, five jurisdictions expressly empower their courts to hold a putative father in contempt for not obeying an order to submit to a blood test.[2] Moreover, numerous statutes permit a trial court either to resolve the issue of paternity against a party refusing to take the test or to "enforce" its order.[3] In fact, of the jurisdictions that prescribe any specific sanction at all

---

**2.** D.C. Code Ann. § 16–2343.2 (Supp.1987); Ga.Code Ann. § 19–7–45 (1982); Mo.Ann.Stat. § 210.834.3 (Vernon Supp.1988); Tex.Fam. Code Ann. § 13.02(b) (Vernon 1986); Wis.Stat.Ann. § 767.48(4) (West Supp.1987).

**3.** *See, e.g.,* Cal.Evid.Code § 892 (West Supp.1988); Del.Code Ann. tit. 13, § 810(g) (Supp.1986); Kan.Stat.Ann. § 38–1118 (1986); La.Rev. Stat.Ann. § 9:396 (West Supp.1988); Me.Rev.Stat.Ann. tit. 19, § 277 (Supp.1987); N.H.Rev.Stat.Ann. § 522.1 (1974); Okla.Stat.Ann. tit. 10, § 501 (West 1987); Ore.Rev.Stat. § 109.252 (1987); 42 Pa.Cons.Stat. Ann. § 6133 (Purdon 1982). *See also* Idaho Code § 7–1116(5) (Supp. 1988) (party's refusal to submit to blood test shall be disclosed to court and is subject to "sanctions" within court's jurisdiction); Mich. Comp.Laws § 722.716(1) (Supp.1988) ("in addition to any other remedies available, the fact of the refusal shall be disclosed at the trial unless good cause is shown"); N.J.Stat.Ann. § 9:17–51.d (West Supp. 1988) (refusal to submit to blood test may be admitted into evidence, shall give rise to presumption that result would have been unfavorable and is subject to "the sanctions within the jurisdiction of the court"); Nev.Rev.Stat. § 126.121.2 (1986) (court may presume result would be adverse to party refusing to submit to test or may "enforce" its order).

It has been held that such statutes permit courts to hold disobedient parties in contempt. *See, e.g., County of Hennepin v. Brinkman,* 378 N.W.2d 790 (Minn.1985), which construed former Minn.Stat.Ann. § 259.62, subd. 4 (West 1982). The Supreme Court of Michigan has agreed to decide whether contempt is one of the "other remedies" authorized in the Michigan statute. *Bowerman v. MacDonald,* 428 Mich. 910, 409 N.W.2d 200 (1987).

for noncompliance with a blood test order,[4] only a few states other than Maryland have not expressly given their courts the power to require an alleged father to obey a blood test order.[5] Under these circumstances, the General Assembly's failure to provide explicitly for any remedy other than the negative inference set forth in § 5–1029(f) strongly implies that the Legislature did not intend that paternity defendants ordinarily be held in contempt for refusing to submit to a court-ordered blood test.

The majority's contrary interpretation of § 5–1029(f) turns the statute on its head. The General Assembly's

---

**4.** A number of statutes are silent as to the penalty for noncompliance. *See, e.g.,* Ariz.Rev.Stat.Ann. § 12–847 (Supp.1987); Colo.Rev.Stat. § 19–4–112 (1987 Cum.Supp.); Conn.Gen.Stat. § 46b–168 (1987); Fla. Stat.Ann. § 742.12 (West Supp.1988); Haw.Rev.Stat. §§ 584–11, (1985 Repl.Vol.); Ind.Code Ann. § 31–6–6.1–8 (Burns 1987 Repl.Vol.); Iowa Code Ann. § 675.41 (1987); Minn.Stat.Ann. § 257.62 (West 1982 & Supp.1988); Mont.Code Ann. § 40–6–112 (1987); Neb.Rev.Stat. § 43–1414 (1984); N.M.Stat.Ann. § 40–11–12 (1986); N.Y.Fam.Ct.Act § 532 (1987); N.C.Gen.Stat. § 8–50.1 (1986); N.D.Cent.Code § 14–17–10 (1981); Ohio Rev.Code Ann. § 3111.09 (Page Supp.1987); Tenn.Code Ann. § 24–7–112 (Supp.1987); Vt.Stat.Ann. tit. 15, § 304 (Supp.1987); Va.Code § 20–49.3 (Supp.1988); Wash.Rev.Code § 26.26.100 (1987); W.Va.Code § 48A–6–3 (1986); Wyo.Stat. § 14–2–109 (1987).

Since these state legislatures have not enumerated a specific remedy other than contempt, it would appear that, under these statutes, a court might hold a party in contempt for disobeying an order requiring submission to a blood test. *Accord County of Hennepin v. Brinkman,* 378 N.W.2d 790 (Minn.1985); *Molly M. v. Edwin F.,* 118 Misc.2d 768, 461 N.Y.S.2d 709 (Fam.Ct.1983).

**5.** *See, e.g.,* Ala.Code § 26–17–12(a) (1975, 1986 Repl.Vol.) (absent good cause, court shall disclose party's refusal to submit to blood test); Ark.Stat.Ann. § 9–10–108(d) (1987) (absent good cause, court shall disclose party's refusal to submit to blood test); Mass.Ann.Laws ch. 209C, § 17 (Law.Co-op Supp.1988) ("The fact that any party refuses to submit to a blood test shall be admissible"); R.I.Gen.Laws, § 15–8–11(a) (Supp.1986) (refusal to take blood test "shall be considered ... along with all other evidence presented"); Utah Code Ann. § 78–25–22 (1987) (despite weight of other evidence, court may resolve question of parentage against party refusing to submit to blood test).

The majority relies on *In re Paternity of D.A.A.P.,* 117 Wis.2d 120, 344 N.W.2d 200 (Ct. of App.1983), in which Wisconsin's intermediate appellate court construed a statute similar to Maryland's as permitting a court to hold a defendant in contempt for disobeying a blood test order. Like the majority opinion, however, the Wisconsin decision is premised on the erroneous assumption that, despite the pertinent statu-

omission of any reference to contempt plainly indicates that it expected the primary sanction under § 5–1029(f) to be the negative inference. Under the majority's view, however, a court is likely to resort to the negative inference only in the minority of cases when a paternity defendant either disappears or refuses to consent to a blood test despite a contempt order. Therefore, the majority's construction thwarts rather than furthers the Legislature's purposes.

## II.

Notwithstanding its extensive review of legislative history, the majority is unable to produce any evidence indicating that the General Assembly ever contemplated that contempt should be an additional remedy under § 5–1029(f).[6] Nonetheless, the majority argues that its conclusion advances the broad policy goals underlying the paternity statutes. According to this argument, the General Assembly did not

---

tory language, a court would have "inherent" power to pass such a contempt order. *See infra* § III.

**6.** To the contrary, the only direct evidence of legislative intent undermines the majority's conclusion. During the 1988 session of the General Assembly, Delegate Horne, the Chairman of the House Judiciary Committee, introduced H.B. 229. This measure would have repealed and reenacted § 5–1029(f) with amendments to provide as follows:

"(f) If any individual fails to submit to a blood test ordered by the court, THE INDIVIDUAL MAY BE PUNISHED BY CONTEMPT OR BY ANY OTHER SANCTIONS THAT THE COURT CONSIDERS APPROPRIATE. IN ADDITION, that refusal, properly introduced in evidence:

(1) shall be disclosed to the court and jury; and

(2) may be commented on by the court or by counsel."

H.B. 229's supporters certainly understood that the sanction of contempt is not available under § 5–1029(f) as it currently stands. Delegate Horne introduced that bill on behalf of the Department of Human Resources, which took the position that the proposed amendment was necessary because "[p]resent law provides only that a trial judge or jury may be advised of a party's failure to appear for blood testing" and because the negative inference is "the exclusive remedy in cases of failure to submit to the tests." Statement by Ann C. Helton, Executive Director, Child Support Enforcement Administration, Maryland Department of Human Resources.

On February 11, 1988, however, H.B. 229 received an unfavorable report and thus died in the House Judiciary Committee. Under the circumstances, this clearly implies a rejection of the majority's position in this case.

intend to "benefit" or to "favor" putative fathers; instead, the Legislature sought to eliminate obstacles to a paternity plaintiff's recovery, thereby " 'protect[ing] illegitimate children,' " " 'assist[ing] [the State] in arriving at more pre-trial settlements,' " and "curtailing the expenditure of 'court time, prosecutor time and staff time.' " [7] Contending that a contrary reading would "favor" defendants and "subvert the general and beneficent purposes of the paternity law," the court concludes that "the General Assembly did not mean to preclude the use of the contempt power to compel a reluctant defendant to submit to [a blood] test."

It is, however, incorrect to suppose that a paternity defendant is "favored" by a holding that the remedy for noncompliance with a blood test order is the negative inference expressly set forth in § 5–1029(f). Few types of evidence show consciousness of guilt or liability as strongly as a person's failure to come forward with evidence which is peculiarly within his possession and which would prove the truth of his assertions. *See generally* II *Wigmore on Evidence* § 285 (J. Chadbourn rev. 1979). As a result, under § 5–1029(f), it is highly likely that a jury will return a plaintiff's verdict after learning that the defendant had

---

7. The majority also emphasizes that, under § 5–1029(e), a blood test satisfying certain conditions "shall be admitted into evidence." The majority evidently views this mandatory language as an authorization for courts to compel paternity defendants to consent to blood tests. I disagree.

Nothing in § 5–1029(e) addresses the manner in which a party to a paternity proceeding may obtain blood test evidence from his or her opponent; rather, as stated above, § 5–1029(e) merely provides that, however obtained, such evidence must be admitted under certain circumstances. Moreover, the majority fails to recognize that, in many cases, blood test evidence will not satisfy the standards of § 5–1029(e) and, consequently, not be admissible. Thus, contrary to the majority's interpretation, it is difficult to conceive of § 5–1029(e) as an overriding mandate in favor of the forced production of blood test evidence. Finally, as the majority acknowledges, in some cases, such as when a defendant disappears or refuses to take a blood test even on pain of contempt, evidence will necessarily be unavailable notwithstanding the "mandate" of § 5–1029(e).

refused to submit to a blood test that could have disproved the plaintiff's allegations.[8]

In addition, the majority opinion contradicts our statement in *Adams v. Mallory*, 308 Md. 453, 466, 520 A.2d 371, 378 (1987), that "[t]he paternity statute embodies the principle that an alleged father may not be officially coerced to give evidence." In reaching this conclusion, the Court explained (308 Md. at 464–465, 520 A.2d at 377):

"[T]he defendant is under no obligation to file a written answer to the complaint. *Id.* at § 5–1012(a) and (c). If he does not respond in writing or does not admit any of the material allegations of the complaint in open court, the court is required to enter a general denial of the complaint on his behalf. *Id.* at § 5–1012(c). It follows from this requirement of section 5–1012(c) that the court may not enter a default order or a default judgment if the alleged father does not answer the complaint. *Cf.* Md. Rules 2–302; 2–321; 2–323; 2–613.

"The same concept is recognized in the statute's special discovery apparatus—the State's Attorney's pretrial inquiry. *Id.* at § 5–1019. Under this provision, the State's Attorney may, before or after a complaint is filed, 'issue a summons that requires a person, *other than the alleged father,* to appear, to testify, and to produce documents connected with the examination.' *Id.* at § 5–1019(b)(1) (emphasis added). . . .

"At the trial itself, the 'alleged father may not be compelled to give evidence.' *Id.* at § 5–1028(d). No comment on or reference to his failure to testify is permitted. *Id.* at § 5–1027(c)."

---

**8.** Moreover, because of the strong likelihood of a finding of paternity under these circumstances and because an HLA test is admissible against a putative father only if it shows a 97.3% probability of paternity, most defendants will elect to take the test. Consequently, even assuming that the statutory sanction is less prejudicial to a defendant than blood test evidence, the majority is incorrect in asserting that, in paternity cases, the remedy of contempt is indispensable to "the search for truth."

Moreover, in *Adams v. Mallory* itself, we held that a court may not enter a default judgment against a paternity defendant who fails to respond to interrogatories. 308 Md. at 467, 520 A.2d at 378.

The majority seems to view these protections as relics of the days when paternity proceedings were considered criminal in nature. Thus, according to the majority opinion, the prohibition against coercing a paternity defendant to produce evidence simply serves to guard a putative father's constitutional privilege against self-incrimination. As the opinion points out, a compulsory blood test to produce evidence against a defendant has been held not to violate the Fifth Amendment's guarantee against self-incrimination. *Schmerber v. California,* 384 U.S. 757, 761, 86 S.Ct. 1826, 1830–1831, 16 L.Ed.2d 908 (1966).[9] Therefore, the

---

**9.** The majority, citing *Davis v. State,* 189 Md. 640, 57 A.2d 289 (1948), implies that this Court has taken the same position under Article 22 of the Maryland Declaration of Rights. *Davis,* however, did not involve a compulsory blood test. Instead, the defendant in *Davis* voluntarily gave blood in a hospital for what he believed to be the purposes of treatment. The State later used that blood as evidence against the defendant. This Court apparently viewed the case as presenting the question of whether the evidence was inadmissible because it was the product of an unlawful search in violation of Article 26 of the Maryland Declaration of Rights. Since the defendant had been charged with a felony rather than a misdemeanor, the Court held that this evidence was admissible under *Meisinger v. State,* 155 Md. 195, 141 A. 536 (1928), and the Bouse Act, Code (1939), Art. 35, § 5. 189 Md. at 645–646, 57 A.2d 289. The Court expressly reserved the question of whether the State could compel an unwilling defendant to give blood which could be used as evidence against him. Moreover, while this Court generally has held that the Self-Incrimination Clause of the Fifth Amendment is in pari materia with Article 22, we have not addressed the question of whether, under Article 22 or 24 of the Maryland Declaration of Rights, a court may compel a person over his objection to give blood which could be used as evidence against him.

In addition, under some circumstances it has been recognized that a compulsory blood test may constitute an unreasonable search and seizure, in violation of the Fourth Amendment to the United States Constitution. *See Schmerber v. California, supra,* 384 U.S. at 767, 86 S.Ct. at 1834. As a consequence, courts in paternity cases have taken the position that, before ordering a defendant to submit to a blood test, it must be determined whether the plaintiff's allegations have some reasonable basis. *See, e.g. Rose v. Dist. Court of Eighth Judicial*

majority concludes that the legislative policy against compelling paternity defendants to produce evidence does not prevent courts from holding such defendants in contempt for not submitting to court-ordered blood tests.

The majority, however, fails to appreciate that, as to a person's freedom to resist coercive governmental invasions of his or her body, the Maryland Legislature traditionally has granted statutory rights that are broader than the constitutional privilege against self-incrimination. For example, when it first permitted the introduction of blood-alcohol tests in prosecutions for driving under the influence of alcohol, the General Assembly expressly provided: "No person shall be compelled to submit himself or any part of his body or bodily substance for the purpose of a chemical analysis provided for in this section." Ch. 769 of the Acts of 1959; Maryland Code (1957, 1965 Repl. Vol.), Art. 35, § 100(c). Furthermore, in 1969 the Legislature rejected the "implied consent" provision of the Uniform Vehicle Code. Instead, the General Assembly enacted Ch. 158 of the Acts of 1969, which provided that, as a condition precedent to the issuance or renewal of a driver's license, Maryland residents were required to consent expressly to a test to determine the alcohol content of their blood, breath, or urine. Code (1957, 1970 Repl. Vol.), Art. 66½, § 6–205.1(a). *See generally State v. Moon*, 291 Md. 463, 479–490, 436 A.2d 420, 428–434 (1981) (Davidson, J., dissenting). Moreover, while Ch. 244 of the Acts of 1981 adopted an implied consent requirement, the Legislature has continued to stipulate that, as a general rule, a person is not required to submit to a chemical test for alcohol. Code (1977, 1987 Repl. Vol.), § 16–205.1(b) of the Transportation Article; Code (1974, 1984 Repl. Vol.), § 10–304 of the Courts and Judicial Proceedings Article.

None of these measures was merely co-extensive with the Fifth Amendment's Self-Incrimination clause. Thus, they

*Dist.*, 628 P.2d 662, 666–667 (Mont.1981); *State v. Meacham*, 93 Wash.2d 735, 738–739, 612 P.2d 795, 798 (1980).

demonstrate the General Assembly's intent that persons should possess additional, statutory protections against governmental attempts to coerce the production of evidence through physical intrusion of the body. In interpreting the paternity statutes as extending no further than the right against self-incrimination, the majority, however, ignores this traditional legislative concern.

### III.

The majority also suggests that, if a court may not hold a defendant in contempt for failing to submit to a blood test, § 5–1029(f) would unconstitutionally limit the inherent power of contempt.[10] I disagree.

One well-recognized limitation on the exercise of civil contempt power is that, when a party has another adequate remedy, a court should not use its contempt power. *See e.g., Gilman v. Altman,* 300 So.2d 703, 706 (Fla.App.1974), *cert. denied,* 314 So.2d 583 (1975); *People v. Mowery,* 116 Ill.App.3d 695, 704, 72 Ill.Dec. 238, 245, 452 N.E.2d 363, 370 (1983) ("The inherent power of contempt is a powerful one; it is not to be used lightly nor when other adequate remedies are available ..."); *State ex rel. Hero,* 36 La.Ann. 352, 354–355 (1884); *Haines v. Haines,* 35 Mich. 138, 144 (1876) ("the process of contempt to enforce civil remedies is one of those extreme resorts which cannot be justified if there is any other adequate remedy"); *Hennig v. Abrahams,* 270 N.Y. 626, 1 N.E.2d 362 (1936), *aff'g* 246 A.D. 621, 282 N.Y.S. 970 (1935); *White v. Gates,* 42 Ohio St. 109, 112 (1884); *Rapalje on Contempts* § 12 (1884). *See also State v. Roll and Scholl,* 267 Md. 714, 734, 298 A.2d 867, 879 (1973) ("Of course, the limits of the power to punish for contempt are '[t]he least possible power adequate to the end proposed' ").

The majority opinion does not contend that the express remedy under § 5–1029(f) is inadequate. In fact, according to the opinion, the statutory remedy is " 'a not inconsequen-

---

**10.** This is the ground on which the circuit court placed its decision.

tial sanction.'" Moreover, if the General Assembly believed that the statutory penalty was not effective, it would have expressly provided for additional penalties. Consequently, the exercise of the inherent power of contempt ordinarily should not extend to cases in which a paternity defendant has refused to take a court-ordered blood test.

Furthermore, even if the express statutory sanction were not an adequate remedy, I do not agree that this case squarely presents the question of whether the General Assembly may limit the inherent power of contempt. In requiring an alleged father to submit to a blood test, a court does not issue the type of equitable order, such as an injunction, a decree of specific performance, or an alimony or support order, that courts traditionally have passed and enforced by contempt without any legislative authorization. Had the present case involved this or a similar type of order, the constitutional question would have been presented in its most pristine form.

As stated above, however, this case involves an order that courts may issue only because of the General Assembly's statutory authorization. Absent the legislative foundation of § 5–1029, courts would have no power, through contempt or otherwise, to require that paternity defendants submit to blood tests. Thus, since § 5–1029 does not take away the contempt power where it had previously existed, it makes little sense to view this case as one in which the Legislature has "limited" the inherent power of contempt.

Finally, even assuming that a court must be able to hold a defendant in contempt for failing to submit to a blood test, it is not necessary to adopt the majority's construction of § 5–1029 in order to uphold the statute's constitutionality. The majority erroneously assumes that § 5–1029 is capable of only two, mutually exclusive interpretations: either the contempt power is available whenever a court would choose to employ it or the contempt power is never available. As a result, the majority fails to recognize that § 5–1029 might be construed as making the negative inference the usual remedy for enforcing compliance with blood test orders but

also providing that, in extraordinary cases, such orders might be enforced by contempt. This reading would avoid the constitutional difficulties that the majority perceives. Moreover, as stated above, the General Assembly's omission of any reference to contempt plainly indicates that it expected the primary sanction under § 5–1029 to be the negative inference. Therefore, by ensuring that the negative inference rather than contempt would serve as the chief means of enforcing blood test orders under § 5–1029, this interpretation better furthers the Legislature's express goals.

For these reasons, I respectfully dissent.

Judges COLE and McAULIFFE have authorized me to state that they concur with the views expressed herein.