741 A.2d 553

TYRONE W.

v.

DANIELLE R., et al.

No. 6448, Sept. Term, 1998.

Court of Special Appeals of Maryland.

Dec. 3, 1999.

Anne C. Ogletree, Denton (Suzanne L. Hood, Easton, on the brief), for appellant.

Mary C. Murphy, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., on the brief), Baltimore, for appellees.

Argued before WENNER, KENNEY and BYRNES, JJ.

BYRNES, Judge.

The Circuit Court for Talbot County denied appellant Tyrone W.'s motion for blood or genetic testing and to set aside an enrolled declaration of paternity respecting T.R., a male child. Tyrone challenges those rulings in this appeal, in which T.R.'s mother, Danielle R., and the Talbot County Bureau of Support Enforcement ("Bureau") appear as appellees. Because we conclude that the lower court erred in denying Tyrone's request for blood or genetic testing, we shall vacate the judgment of the circuit court, and remand the case for further proceedings.

## FACTS

Danielle gave birth to T.R. on January 8, 1989. Four months later, on April 27, 1989, Danielle and Tyrone entered into a written agreement ("Agreement") in which Tyrone acknowledged paternity of T.R. and promised to pay $35.00 per week in child support and a portion of T.R.'s medical expenses not covered by insurance.[1]

On May 3, 1989, Danielle filed a paternity action in the Circuit Court for Talbot County. The action was filed with the consent of the Talbot County State's Attorney's Office.[2] It contained a "Notice to Defendant" advising Tyrone of his right to have the issue of paternity tried by a jury and informing him that unless he elected a jury trial, that right would be deemed waived and the matter would be tried by the court. Danielle attached the Agreement to her complaint.

Six days later, on May 9, 1989, the circuit court entered a judgment of paternity declaring Tyrone to be the father of

---

**1.** The Agreement was entered into as a "voluntary support agreement" pursuant to Md.Code (1984, Repl.Vol.1999), § 5–1010 of the Family Law Article ("F.L.").

**2.** Pursuant to F.L. § 5–1010, except when a paternity complaint is filed by the Child Support Enforcement Administration of the Department of Human Resources, a paternity complaint may not be filed without the consent of the State's Attorney, unless the court finds that it is meritorious and rules that consent is not required.

T.R. and ordering him to pay child support and medical expenses in accordance with the terms of the Agreement. Further tracking the Agreement, the court granted custody and guardianship of T.R. to Danielle and visitation rights to Tyrone, and ordered that Tyrone's support obligations continue until T.R. should reach the age of eighteen, die, marry, or become self-supporting.

The record in the 1989 paternity action does not contain a docket entry reflecting service upon Tyrone. It is undisputed, however, that Tyrone was aware of the court's judgment and abided by it.

On April 7, 1998, almost nine years after the entry of the paternity judgment, Danielle and the Bureau filed in the 1989 paternity case a petition for increase in child support, pursuant to Md.Code (1984, Repl.Vol.1999), § 10–115 of the Family Law Article ("F.L."). Tyrone responded by filing a paper entitled "Response to Petition for Increase in Child Support and Complaint to Set Aside Declaration of Paternity." He alleged that several years after T.R.'s birth, he discovered that during the approximate time of T.R.'s conception, Danielle had engaged in sexual intercourse with other men and that, contrary to what Danielle had told him before he signed the Agreement, he is not T.R.'s biological father. Tyrone asked the court to order Danielle and T.R. to submit to blood or genetic testing in accordance with F.L. § 5–1029, and further requested that it set aside the 1989 paternity judgment, should the testing confirm his belief that he is not T.R.'s biological father.

The circuit court referred Tyrone's motion for blood or genetic testing to a domestic relations master. On August 7, 1998, the master held an evidentiary hearing, at which Tyrone and Danielle testified. Tyrone explained that when Danielle told him she was pregnant with his child, he had not known that she had any other boyfriends. After T.R. was born, he was approached by a representative of the Talbot County State's Attorney's Office who presented the Agreement to him and told him that he "could get blood tests at that time." Tyrone testified that he decided not to have blood tests done

then because he believed Danielle when she told him he was the baby's father, and he had no reason to think otherwise.

According to Tyrone, by the time that T.R. had reached the age of five, Tyrone could see that there was no physical resemblance between them. A few years later, Tyrone learned from a friend that around the time that T.R. was conceived, Danielle had been involved with a man named James P. Tyrone noticed that T.R. resembled James P. Tyrone introduced into evidence a photograph of T.R. and a high school yearbook containing a photograph of James P. at age fifteen or sixteen.[3] Tyrone testified that when he confronted Danielle about T.R.'s resemblance to James P., she responded angrily, saying that "if" T.R. was determined to be "his" (Tyrone's) child, she would try to get an increase in child support to $70.00 per week "for putting [her] through this." Tyrone took Danielle's use of the word "if" as a concession that she had doubts as to whether he was T.R.'s biological father.

Tyrone testified that he saw T.R. only rarely and that they were not close.

In her testimony, Danielle acknowledged that she had been involved in a sexual relationship with James P., but explained that the relationship had occurred three years before T.R. was conceived and again three years after T.R.'s birth. She denied being sexually involved with James P. at the time of T.R.'s conception, and testified that she is positive that Tyrone is T.R.'s biological father.

At the conclusion of the hearing, the master issued a report recommending that genetic testing be performed to establish scientifically whether Tyrone could be excluded as T.R.'s biological father. The master found that Tyrone had admitted paternity in the past because he had had no reason to think he was not T.R.'s biological father and that, when the issue of paternity resurfaced years later, Danielle's response to it indicated that she was uncertain about Tyrone's paternity of

---

3. The high school yearbook was moved into evidence but is not included in the record.

T.R. The Bureau filed exceptions to the master's report and recommendation. It did not request a hearing.

On August 18, 1998, the circuit court issued a memorandum opinion and order rejecting the master's recommendation and denying Tyrone's motion to set aside the 1989 paternity judgment. The court noted, "there is no authority under Maryland law which permits a court to revise a paternity judgment after 30 days except in the case of fraud, mistake, irregularity, or clerical error." It further stated that even if Tyrone were to prove that "he was 'mistakenly' made the father [of T.R.,]" his motion to set aside the enrolled judgment would fail because "by waiting over nine years after a final judgment was entered before filing a motion to vacate" Tyrone had "failed to act with ordinary diligence." Concluding that Tyrone had "had full knowledge of the original paternity complaint, and [that] he had knowingly waived his right to counsel, a blood test, a trial by judge or jury, and the right to call and cross-examine witnesses[,]" the circuit court ruled that Tyrone "is bound by the 1989 judgment."

In his appeal to this Court, Tyrone poses three questions for review, which we have rephrased:

I. Did the trial court err as a matter of law in ruling that the 1989 paternity judgment could not be vacated except upon a finding of fraud, mistake, irregularity, or clerical error?

II. Did the trial court err as a matter of law or fact in denying his request for blood or genetic testing under F.L. § 5–1029?

III. Were the trial court's findings of waiver and lack of ordinary diligence legally incorrect and/or clearly erroneous?

## DISCUSSION

### I.

### *Timing of Appeal*

Although not raised by the parties, we first address the jurisdictional question whether this appeal was timely filed.

*Newman v. Reilly,* 314 Md. 364, 387–88, 550 A.2d 959 (1988)(holding that timeliness of filing of notice of appeal is a jurisdictional issue).

The circuit court's memorandum opinion and order was docketed on August 19, 1998. On September 16, 1998, at Tyrone's request and with the consent of Danielle and the Bureau, the court issued an "Order of Finality" purporting to certify for appeal, under Rule 2–602(b), the resolution of Tyrone's challenge to the paternity judgment. Tyrone noted this appeal the same day. At that time, the claim for an increase in child support was still pending before the circuit court. By an order dated November 4, 1998, and docketed November 6, 1998, the court granted the requested increase.

The circuit court's September 16, 1998 "Order of Finality" did not include an express finding of "no just reason for delay." For this reason, its attempt to finalize Tyrone's claim for appeal under Rule 2–602(b) was ineffective. *Waters v. United States Fidelity & Guar. Co.,* 328 Md. 700, 707–08, 616 A.2d 884 (1992); *Town of Port Deposit v. Petitit,* 113 Md.App. 401, 409, 688 A.2d 54 (1997). It was not until November 6, 1998, when the order granting an increase in child support was docketed, that an order constituting a final, appealable judgment was entered. Thus, the present appeal was noted prematurely, and the thirty-day period in which to note an appeal from the November 6, 1998 final judgment has expired. As we shall explain below, Rule 8–602(e) nevertheless enables us to assume jurisdiction over the appeal. *Cf. Jenkins v. Jenkins,* 112 Md.App. 390, 424–26, 685 A.2d 817 (1996)(holding that that Court did not have jurisdiction over appeal pursuant to Rule 8–602(e) where appellant noted appeal prematurely because the trial court erroneously ordered a final judgment when it did not have such discretion under Rule 2–602).

Rule 8–602(e), entitled *"Entry of judgment not directed under Rule 2–602,"* provides, in relevant part:

(1) If the appellate court determines that the order from which the appeal is taken was not a final judgment when the

notice of appeal was filed but that the lower court had discretion to direct the entry of a final judgment pursuant to Rule 2–602(b), the appellate court may, as it finds appropriate ... (D) if a final judgment was entered by the lower court after the notice of appeal was filed, treat the notice of appeal as if filed on the same day as, but after, the entry of the judgment.

Rule 2–602(b) permits a circuit court to finalize for appeal an order or decision that adjudicates fewer than all of the claims in an action or the rights and liabilities of fewer than all the parties. This discretionary authority is to be used sparingly, in order to minimize "piecemeal appeals and duplication of efforts and costs in cases involving multiple claims or multiple parties." *Maryland–Nat'l Capital Park & Planning Comm'n v. Smith*, 333 Md. 3, 7, 633 A.2d 855 (1993).

In this case, the circuit court had discretion under Rule 2–602(b) to enter a final judgment with respect to Tyrone's challenge to the paternity declaration, attendant upon an express determination by the court that there was "no just reason for delay." Tyrone's motion to set aside the paternity judgment was a separate claim for purposes of certification under Rule 2–602. The claim was based on a set of operative facts discrete from the facts relevant to the claim for an increase in child support, requested an entirely distinct form of relief, and could have been separately enforced. *See Medical Mutual Liab. Ins. Soc'y v. B. Dixon Evander & Assocs.*, 331 Md. 301, 309–10, 628 A.2d 170 (1993), *on subsequent appeal*, 339 Md. 41, 660 A.2d 433 (1994); *Diener Enters., Inc. v. Miller*, 266 Md. 551, 556, 295 A.2d 470 (1972). Furthermore, despite the subsequent judgment increasing child support, appellant only seeks review of the denial of his affirmative claim—there is no danger of multiple, piecemeal appeals from the judgment below. Accordingly, we invoke our discretion under Rule 8–602(e) to treat the notice of appeal as if it had been filed on the same day as, but after, the entry of a final judgment on November 6, 1998.

## II.

### *Applicability of the 1995 Amendment to F.L. § 5–1038(a) to the 1989 Paternity Judgment*

### The *Tandra S. v. Tyrone W.* Decision

In *Tandra S. v. Tyrone W.*, 336 Md. 303, 306–08, 648 A.2d 439 (1994), the Court of Appeals held that an "enrolled" paternity judgment (i.e., one entered by the court more than 30 days prior) could not be set aside except upon proof of fraud, mistake, or irregularity, under Md.Code (1974, 1998 Repl.Vol.), § 6–408 of the Courts and Judicial Proceedings Article ("C.J."), and Rule 2–535(b). The facts in the *Tandra S.* case are well known to Tyrone because he was the "adjudged father" in that case, too.[4]

The *Tandra S.* case concerned T.W., a baby girl born in 1990. Soon after the child's birth, Tyrone accepted the mother's representation that he was the child's father, and entered into a written agreement in which he acknowledged paternity and promised to pay child support. Tandra S. then filed a paternity action based on the agreement, in the Circuit Court for Talbot County. A paternity judgment was entered against Tyrone. Two and one-half years later, Tyrone filed motions for blood testing[5] and to set aside the paternity declaration. He alleged that Tandra S. recently had told him that he was not T.W.'s father. The circuit court granted Tyrone's motion for blood testing. The test results excluded Tyrone as T.W.'s

---

4. In *Tandra S. v. Tyrone W.*, the term "adjudged father" was used to describe a man who has been adjudicated to be the father of the child in a paternity action. 336 Md. at 310, 648 A.2d 439. We will use that term in this opinion. Also, we will use the term "alleged father" to mean a man who is alleged to be the father of a child in a paternity proceeding, before a judicial declaration of paternity. *Id.* at 309, 648 A.2d 439.

5. Tyrone filed his motion for testing pursuant to F.L. § 5–1029. At that time, that section was entitled "Blood testing," and the tests it addressed were termed "blood tests." In 1994, F.L. § 5–1029 was amended to insert the words "or genetic" after the word "blood" throughout the section and to change the title of the section to "Blood or genetic testing." 1994 Md. Laws, ch. 113.

biological father. On that basis, the circuit court vacated the enrolled paternity judgment.

The Court of Appeals granted certiorari prior to the consideration of Tyrone's appeal by this Court.[6] In a split decision, it reversed, holding that the enrolled judgment of paternity could not be revised solely on the basis of scientific evidence establishing that Tyrone was not T.W.'s biological father. The majority cited the strict limitation on the court's revisory power over enrolled judgments as set forth in Rule 2–535(b),[7] discussed the well-developed body of case law interpreting that limitation, and concluded that even though it had been proven scientifically that Tyrone was not T.W.'s biological father, Tyrone had not met the exceptional showing of fraud, mistake, or irregularity necessary to warrant the vacation of an enrolled judgment.

In reaching its holding, the majority in *Tandra S.* took into account and interpreted F.L. § 5–1038, which appears in the "Paternity Proceedings" subtitle of the Family Law Article

---

**6.** Before the Court of Appeals, *Tandra S. v. Tyrone W.* was consolidated with another similar case, *Baltimore City Office of Child Support Enforcement, State Department of Human Resources v. John S., Jr.* In the *John S., Jr.* case, the circuit court vacated an enrolled judgment of paternity against John S., Jr. after the mother of the child at issue acknowledged that he was not the child's biological father. In an unreported opinion, this Court affirmed the judgment vacating the paternity declaration.

**7.** Rule 2–535 provides, in relevant part:

(a) *Generally.* On motion of any party filed within 30 days after entry of judgment, the court may exercise revisory power and control over the judgment and, if the action was tried before the court, may take any action that it could have taken under Rule 2–534.

(b) *Fraud, Mistake, Irregularity.* On motion of any party filed at any time, the court may exercise revisory power and control over the judgment in case of fraud, mistake, or irregularity.

Additionally, C.J. § 6–408 provides:

For a period of 30 days after the entry of a judgment, or thereafter pursuant to motion filed within that period, the court has revisory power and control over the judgment. After the expiration of that period the court has revisory power and control over the judgment only in case of fraud, mistake, irregularity, or failure of an employee of the court or of the clerk's office to perform a duty required by statute or rule.

and is captioned, "Finality; modification." At the time that *Tandra S.* was decided, that statute provided, in relevant part:

(a) *Declaration of paternity final.*—Except in the manner and to the extent that any order or decree of an equity court is subject to the revisory power of the court under any law, rule, or established principle of practice and procedure in equity, a declaration of paternity in an order is final.

(b) *Other orders subject to modification.*—Except for a declaration of paternity, the court may modify or set aside any order or part of an order under this subtitle as the court considers just and proper in light of the circumstances and in the best interests of the child.

Md.Code (1984, 1991 Repl.Vol.), F.L. § 5–1038. The Court construed those subsections of F.L. § 5–1038 to mean that the circuit court had broad discretion to modify an *order relating to paternity* (such as a judgment establishing the amount of child support to be paid) but only could set aside a *declaration of paternity* on one of the bases prescribed by Rule 2–535(b).

Two judges dissented in *Tandra S.* They reasoned that F.L. § 5–1007 compelled a contrary result. That statute provides:

Any rule of court or statute that relates to procedure applies to a proceeding under [the Paternity Proceedings] subtitle only to the extent that the rule or statute is: (1) practical under the circumstances; and (2) not inconsistent with this subtitle.

Writing for the dissent, Judge Eldridge explained that "a paternity action differs significantly from other adjudications and merits different treatment." *Tandra S.*, 336 Md. at 326, 648 A.2d 439 (Eldridge, J., dissenting). He distinguished paternity actions from ordinary legal actions in that, in the former, courts are called upon "to declare a scientific, biological fact"—whether an individual is the biological father of the child in question. *Id.* at 327, 648 A.2d 439. After discussing the accuracy of modern day blood and genetic testing, Judge Eldridge observed, "It is absurd, in the face of incontrovertible scientific evidence, for a court to treat as binding, for the

future, a patently erroneous declaration of biological fact." *Id.* On that basis, the dissenters in *Tandra S.* took the position that Rule 2–535(b) is a procedural rule and that it could not be applied in a practical manner to the facts in *Tandra S.*, and therefore could be relaxed under F.L. § 5–1007. *Id.* at 329, 648 A.2d 439.

### The General Assembly Amends F.L. § 5–1038(a)

*Tandra S.* was decided by the Court of Appeals on October 7, 1994. During the following legislative session, in early 1995, the General Assembly enacted House Bill 337, which repealed and reenacted, with amendments, F.L. § 5–1006 and F.L. § 5–1038. The amendment to F.L. § 5–1006 extended the limitations period for a paternity action to "any time before the child's eighteenth birthday." 1995 Md. Laws, ch. 248. F.L. § 5–1038(a) was amended to permit a court to modify or set aside a paternity judgment on the basis of scientific evidence establishing that the child's adjudged father is not his biological father. Subsection (a) of F.L. § 5–1038 now provides:

(a) *Declaration of paternity final; modifications.*—(1) Except as provided in paragraph (2) of this subsection, a declaration of paternity in an order is final.

(2) (i) *A declaration of paternity may be modified or set aside:*

1. in the manner and to the extent that any order or decree of an equity court is subject to the revisory power of the court under any law, rule, or established principle of practice and procedure in equity; or

2. *if a blood or genetic test done in accordance with § 5–1029 of this subtitle establishes the exclusion of the individual named as the father in the order.*

(ii) Notwithstanding subparagraph (i) of this paragraph, a declaration of paternity may not be modified or set aside if the individual named in the order acknowledged paternity knowing he was not the father.

F.L. § 5–1038(a) (emphasis added).[8] The Act stated that it "shall take effect October 1, 1995."

In the case *sub judice,* the parties dispute whether F.L. § 5–1038(a)(2)(i)(2), as enacted in 1995, applies to the 1989 paternity judgment respecting T.R. Tyrone contends that the 1995 amendment to F.L. § 5–1038(a) permits a circuit court to vacate a paternity judgment if blood or genetic testing performed in accordance with F.L. § 5–1029 excludes the adjudged father, irrespective of when the paternity judgment was entered, so long as the child at issue is not yet eighteen years old. From that position, Tyrone reasons that if blood or genetic testing were to reveal that he is not T.R.'s biological father, the circuit court would be authorized to exercise its discretion to vacate the 1989 paternity judgment. Therefore, the circuit court erred in denying him access to blood or genetic tests that he believes will show that he is not T.R.'s biological father, and in ruling on his motion to set aside the paternity judgment without taking the test results into consideration.

Danielle and the Bureau counter that the 1995 amendments to F.L. § 5–1006 and F.L. § 5–1038 do not apply to a paternity judgment entered six years before. Even if blood or genetic testing had been ordered and the test results scientifically had excluded Tyrone as T.R.'s biological father, the trial court would have been without authority to set aside the paternity judgment on that basis. They maintain that because any blood or genetic test results thus would have been immaterial, the circuit court properly denied Tyrone's request for testing.

**Retroactive operation *vel non* of F.L. § 5–1038(a)(2)(i)(2)**

A statute that applies retroactively or retrospectively is one that "purports to determine the legal significance of acts or events that have occurred prior to the statute's effec-

---

8. With the exception of revisions in 1997 that we explain in Parts III. and IV., *infra,,* the present wording of this subsection is as it was enacted in 1995.

tive date." *State Comm'n on Human Relations v. Amecom Div. of Litton Sys., Inc.,* 278 Md. 120, 123, 360 A.2d 1 (1976). "Thus a statute, though applied only in legal proceedings subsequent to its effective date and in that sense, at least, prospective, is, when applied so as to determine the legal significance of acts or events that occurred prior to its effective date, applied retroactively." *Id.* The prior "acts or events" affected by a statute that operates retroactively include the rendering of a judgment by a court. *See Attorney Grievance Comm'n v. Klauber,* 284 Md. 306, 308, 396 A.2d 253 (1979). Thus, for Tyrone to be able to avail himself of the 1995 revision to F.L. § 5-1038(a) to set aside the 1989 judgment of paternity, that statutory revision must have had retroactive effect.

### (i)

Whether a statute operates retrospectively or only prospectively is in the first instance a question of legislative intent. *See Young v. State,* 14 Md.App. 538, 552–53, 288 A.2d 198 (1972)(in determining retroactivity *vel non* of legislation, it is the intent of the legislature in enacting the law that controls.). "Because of the potential for interference with substantive rights, however, and because of the resulting prejudice against retroactive application," a statute that affects substantive rights is presumed to operate prospectively. *State Comm'n on Human Rel. v. Amecom Div.,* 278 Md. 120, 123–24, 360 A.2d 1 (1976); *see also Informed Physician v. Blue Cross,* 350 Md. 308, 327, 711 A.2d 1330 (1998). That presumption may be rebutted by a clear expression in the statute to the contrary. *Janda v. General Motors Corp.,* 237 Md. 161, 168–69, 205 A.2d 228 (1964); *Tax Comm. v. Power Company,* 182 Md. 111, 117, 32 A.2d 382 (1943)(presumption is rebutted when the statute's "words are so clear, strong and imperative in their retrospective expression so that no other meaning can be attached to them, or . . . the manifest intention of the Legislature could not be otherwise gratified."). If the Legislature meant for a law affecting a matter of right or substance to operate retrospectively, the law will be given that

effect so long as doing so is not unconstitutional and does not interfere with vested rights. *Amecom,* 278 Md. at 123, 360 A.2d 1; *Janda,* 237 Md. at 169, 205 A.2d 228. An analysis of whether a statute applies retroactively thus embraces three questions: 1) did the Legislature intend the statute to operate retroactively? 2) did the Legislature have the power to enact the statute retroactively? and 3) would retroactive application of the statute interfere with vested rights? *Waters Landing Limited Partnership v. Montgomery County,* 337 Md. 15, 28–29, 650 A.2d 712 (1994).

When a statute affects only a procedure or remedy, and not a substantive right, the presumption in favor of prospective application does not apply. *Informed Physician Services, Inc.,* 350 Md. at 327, 711 A.2d 1330; *Amecom,* 278 Md. at 124, 360 A.2d 1. To the contrary, procedural and remedial enactments are presumed to operate retroactively, unless a contrary legislative intent is expressed. *State Administrative Board v. Election Board of Baltimore,* 342 Md. 586, 601, 679 A.2d 96 (1996); *Grandison v. State,* 341 Md. 175, 257, 670 A.2d 398 (1995); *Mason v. State,* 309 Md. 215, 219–20, 522 A.2d 1344 (1987); *Aviles v. Eshelman Elec. Corp.,* 281 Md. 529, 533, 379 A.2d 1227 (1977)("[a]bsent a contrary intent made manifest by the enacting authority, any change made by statute or court rule affecting a remedy only (and consequently not impinging on substantive rights) controls all court actions whether accrued, pending or future.") The same rules of statutory interpretation apply to amendatory acts. *State Tax Comm'n v. Potomac Elec.,* 182 Md. 111, 117, 32 A.2d 382 (1943); *Harlow v. Schrott,* 16 Md.App. 31, 37, 294 A.2d 349, *reversed on other grounds, Blocher v. Harlow,* 268 Md. 571, 303 A.2d 395 (1973).

In this case, the contents of the legislative bill file for House Bill 337 make plain that the 1995 amendment to F.L. § 5–1038(a) authorizing courts to revise enrolled paternity judgments on the basis of scientific evidence obtained pursuant to F.L. § 5–1029 and excluding the adjudged father as the biological father was enacted in response to the Court of

Appeals's decision in *Tandra S.* The bill file contains a copy of the *Tandra S.* opinion, an October 23, 1994 *Baltimore Sun* article about the case, entitled "Md. High Court's Paternity Ruling Fathers Bizarre Justice," and several letters commenting about the bill that refer expressly to the *Tandra S.* case.

The Act itself provides that it is "[f]or the purpose of clarifying the statute of limitations applicable to paternity proceedings; authorizing a court to modify or set aside a declaration of paternity under certain circumstances; and generally relating to paternity proceedings." 1995 Md. Laws, ch. 248. Neither the words of the statute nor the material in the bill file addresses, however, the question of prospective or retrospective application of the statutory amendment. The answer to that question turns, therefore, on whether the amendment is one affecting a substantive right or affecting only a procedure or remedy. If the former is the case, the 1995 amendment operates prospectively, because it is presumed to do so and there is no clear statement of legislative intent to the contrary. If the latter is the case, the inverse presumption is applied and the statutory amendment has retrospective effect.

A statute that is purely procedural is one that has to do with the steps that must be taken to enforce a right. Such a statute will be "construed as operating on all proceedings instituted after its passage whether the right accrued before of after that event." *Kelch v. Keehn,* 183 Md. 140, 145, 36 A.2d 544 (1944). Because procedural enactments will not be applied so as to undo already concluded proceedings, *see Holland v. Woodhaven Bldg. & Dev., Inc.,* 113 Md.App. 274, 287, 687 A.2d 699 (1996), they are retroactive in effect in the sense that they apply immediately to actions that already have accrued. *See Roth v. Dimensions,* 332 Md. 627, 632 A.2d 1170 (1993)(holding that statute mandating an extension of time in which a plaintiff in a medical malpractice case may file a certificate of qualified expert circumstances was procedural and therefore applied retroactively to cases pending when the law was enacted); *see also The Wharf At Handy's Point, Inc.*

*v. Department of Natural Resources,* 92 Md.App. 659, 675, 610 A.2d 314 (1992).

In our view, the 1995 amendment to F.L. § 5–1038 is not procedural. It did not specify or delineate the measures that must be taken by a party to a paternity action to seek revision of an enrolled paternity judgment. Indeed, the process for seeking revision of a paternity judgment is no different today than it was before F.L. § 5–1038 was amended. *Compare Colgan v. Hammond,* 58 Md.App. 120, 472 A.2d 497 (1984)(holding that 1982 statutory amendment allowing certain blood test results to be used as affirmative evidence of paternity was procedural in nature, did not affect parties' substantive rights and, therefore, applied retrospectively to paternity action filed in 1981). Rather, the amendment to F.L. § 5–1038(a) added to the four grounds for revision of an enrolled paternity decree (extrinsic fraud, mistake, irregularity, and failure of an employee of the court or the clerk's office to perform a required duty) a new scientific ground on which the court may exercise its discretion to relieve a party from an enrolled paternity judgment.

 Whether a statute is remedial in the sense that it relates to a remedy without affecting substantive rights is a thornier question. A remedial enactment may be one affecting a remedy in that it provides a new method for enforcing a preexisting right or changes an existing remedy for enforcing a preexisting right. *Amecom,* 278 Md. at 125, 360 A.2d 1. *See also* 2 Norman J. Singer, *Sutherland Statutory Construction* § 60.02 at 152 (5th ed. 1993)("Generally, remedial statutes are those which provide a remedy, or improve or facilitate remedies already existing for the enforcement of rights and the redress of injuries."). A statute that goes beyond that and provides a new form of relief that itself constitutes a substantive right is not purely remedial, however, and will not be presumed to apply retroactively. *Id.* Thus, notwithstanding that an enactment extinguishing a cause of action or barring a party from prosecuting a cause of action is characterized as remedial, it affects substantive rights, and therefore is not

remedial. *See Washington Suburban Sanitary Comm'n v. Riverdale Fire Co.,* 308 Md. 556, 560, 520 A.2d 1319 (1987); *Southerland v. Norris,* 74 Md. 326, 329, 22 A. 137 (1891).

As we have explained, the 1995 amendment to F.L. § 5–1038(a) added, in paternity actions, a new basis on which the circuit court may exercise its discretion to revise an enrolled judgment. The common law recognized the power and authority to revise its judgments as inherent in the court. *North v. Town Real Estate Corp.,* 191 Md. 212, 216, 60 A.2d 665 (1948); *Waters v. Engle,* 53 Md. 179, 182 (1880). Because the countervailing public policy in favor of bringing litigation to a conclusion strongly militated against the broad invocation of the courts' revisory powers, the courts came to strictly limit the circumstances warranting the exercise of that power. *Kemp v. Cook,* 18 Md. 130, 138 (1861). The rule thus emerged at common law that during the term of court in which a judgment was entered, the court's authority to exercise its discretion to revise the judgment was unlimited, but that after the expiration of the term, the court's revisory authority was restricted to a small and fixed set of circumstances calling for equitable intervention (extrinsic fraud, mistake, or irregularity). *Smith v. Black,* 51 Md. 247, 251 (1879); *Taylor v. Sindall,* 34 Md. 38, 40 (1871). The common law rule has been adopted and delineated in Maryland in Rule 2–535(b) and its predecessor rules, and in C.J. § 6–408. *See Eliason v. Comm'r of Personnel,* 230 Md. 56, 58–9, 185 A.2d 390 (1962)(commenting that Rule 625, predecessor to Rule 2–535, merely restated the substance of the common law rule governing the exercise by the court of its revisory power).

A circuit court's decision about whether to grant a party relief from a judgment (except from a judgment that is void as having been entered without jurisdiction, *see Eisenhardt v. Papa,* 46 Md.App. 375, 384–85, 416 A.2d 784 (1980); *Miles v. Hamilton,* 269 Md. 708, 713, 309 A.2d 631 (1973)) on one of the grounds available for doing so is an equitable consideration within its sound discretion. *Kemp v. Cook,* 18 Md. at 139. "[T]he decision involves taking account of several

incommensurable factors, some relating to the particular case and others to the larger system of administered justice." *Restatement of Judgments, Second,* § 74, cmt. g. Consistent with equitable principles, the party seeking relief from an enrolled judgment must show that he exercised ordinary diligence in discovering the ground for relief and in requesting relief, that he acted in good faith, and that he has a meritorious claim or defense. *J.T. Masonry Co., Inc. v. Oxford Construction Services, Inc.,* 314 Md. 498, 506, 551 A.2d 869 (1989).

A court's discretionary exercise of its revisory power to afford a party relief from an enrolled judgment is thus in the nature of an equitable remedy. By amending F.L. § 5–1038(a) to add a new basis on which the court may exercise its power to grant relief from an enrolled judgment of paternity, the General Assembly affected a remedy by broadening it. So long as by doing so it did not create a new substantive right or disturb a preexisting substantive right, the statutory amendment is remedial and is presumed to apply retrospectively. We will return to that topic shortly.

An enactment also may be regarded as "remedial in nature" if its object is to correct existing law, "to redress existing grievances[,] and to introduce regulations conducive to the public good." *State v. Barnes,* 273 Md. 195, 208, 328 A.2d 737 (1974)(holding "remedial in nature" the Interstate Agreement on Detainers Act of 1965). As such, remedial statutes "are to be liberally construed in order to advance the remedy and obviate the mischief." *Id.; Coburn v. Coburn,* 342 Md. 244, 256, 674 A.2d 951 (1995); *see also Janda,* 237 Md. at 171, 205 A.2d 228 (holding that statute would be applied retroactively when to do so would better effect the remedial intentions of the Legislature in enacting it.).

At their inception, the Maryland civil paternity laws, of which F.L. § 5–1038 is a part, were remedial in nature. Civil paternity laws first were enacted in Maryland effective June 1, 1963, as part of Laws of Maryland (1963), chapter 722. They replaced the existing criminal bastardy and fornication laws,

which were repealed by the same Act.[9] As the Court of Appeals discussed at some length in *Gill v. Ripley*, 352 Md. 754, 724 A.2d 88 (1999), the 1963 changes in the law to a large extent implemented recommendations made by the Commission to Study Problems of Illegitimacy. *See Gill*, 352 Md. at 778, 724 A.2d 88. In its 1961 Final Report to the Maryland General Assembly, the Commission concluded that under the bastardy and fornication laws then in effect, any concern for the support and maintenance of "illegitimate children" merely was derivative of the legislative goals of punishment and of keeping "bastards" from becoming public charges. *Final Report of the Commission to Study Problems of Illegitimacy* at 12–13 (December, 1961)("Final Report"). "The child's welfare, custody and proper maintenance ha[d] received generally little or no consideration." *Id.* at 13. The determination of paternity was incidental to the criminal charge of fornication brought against the putative father. *See* Final Report at 22.[10]

The paternity laws enacted in 1963 contained an explicit statement of purpose: "The General Assembly declares its

---

9. In *Eagan v. Ayd*, 313 Md. 265, 268–69, 545 A.2d 55 (1988), the Court explained that although the bastardy and fornication laws usually were characterized as "criminal," they technically were not criminal proceedings. *See Kennard v. State*, 177 Md. 549, 553, 10 A.2d 710 (1940). Yet, they were treated as criminal proceedings. *See Fiege v. Boehm*, 210 Md. 352, 359, 123 A.2d 316 (1956).

10. In the words of the Commission:

> Under the present Maryland law, determination of a bastard's paternity is incidental to what is in effect a criminal charge of fornication brought against the putative father, with a probation order to contribute to the child's maintenance being the usual alternative to a two-year prison term. To establish paternity and provide for the child's support, the State must "beyond a reasonable doubt," prove the man's "guilt," and in so doing it is restricted by technicalities of the criminal law as to time limitations, situs of the act of fornication, and inadmissibility of a married woman's testimony as to any bastard born to her. Not only do many men now escape any responsibility for the maintenance of their illegitimate children, but the present law is also inadequate ... because it neither makes provision for inquiry into the child's custody and welfare, nor provides for a determination of the mother's obligation to support.

> Final Report at 22.

conviction that the State has a duty to ameliorate the deprived social and economic status of children born out of wedlock...." 1963 Md. Laws, ch. 722, § 1, 1499. The legislation sought to promote "the general welfare and best interests of such children by securing to them, as near as practical, the same right to support, care and education as legitimate children," and to that end imposed "upon both parents of such children the basic obligations and responsibilities of parenthood." *Id.* In *Corley v. Moore,* 236 Md. 241, 243, 203 A.2d 697 (1964), *superseded by statute on other grounds as stated in Toft v. Nevada ex rel. Pimentel,* 108 Md.App. 206, 217, 671 A.2d 99 (1996), the Court relied upon the General Assembly's pronouncement of its statements of legislative intent in holding the paternity laws remedial and applying them to a proceeding involving a child born *before* the legislation's effective date. *Corley,* 236 Md. at 243, 203 A.2d 697.[11]

It was clear at the inception of the new paternity subtitle that the obligations imposed upon the "parents" of a child born out of wedlock were the obligations of the biological parents of the child. *See* Final Report at 16 ("[M]easures to hold natural parents to basic responsibilities cannot wait."). By securing to children born to unmarried parents "the same right to support, care and education," the statute plainly referred to the ancient common law and statutory duty of natural, *i.e.,* biological, parents to support their children. *See Middleton v. Middleton,* 329 Md. 627, 633, 620 A.2d 1363 (1993) (statutory duty of support is "reflective of the common law"); *Blades v. Szatai,* 151 Md. 644, 647, 135 A. 841 (1927) (common law duty). The legal determination of paternity was, and is, a means to confer upon a child whose biological parents were not married the common law and statutory rights that he would have if his biological parents had been married.

We hold that the 1995 amendment to F.L. § 5–1038(a) is remedial in both senses in which that term is used, and that it

---

11. It has been the case since the enactment of the civil paternity statute that a paternity action does not accrue until the birth of the child. *See* 1963 Md. Laws ch. 722, § 1, 1497, 1502; F.L. § 5–1025.

therefore operates retrospectively, applying to enrolled paternity judgments entered before its effective date. It is remedial in that it is an expansion of the equitable grounds on which a court may relieve from the effect of a paternity judgment an adjudged father who later has been determined not to be the biological father of the child in question. In addition, it is remedial in that it advances the purpose of the remedial subtitle of which it is a part: to assure to children born out of wedlock the same rights with respect to their biological parents that children of married parents have with respect to their biological parents.

We also conclude, as is integral to our holding, that the statutory amendment at issue is one affecting a remedy but not affecting substantive rights. The civil paternity laws were enacted to replace laws that served the primary purpose of punishing the parents of children born out of wedlock with laws designed to aid children born out of wedlock by providing a means to determine biological paternity and requiring that biological fathers (as well as mothers) protect their children as required by law. Under the common law, a biological child, whether born in wedlock or out of wedlock, was entitled to support and care from his biological parents. In *Carroll County v. Edelmann*, 320 Md. 150, 577 A.2d 14 (1990), the Court stated:

> Parenthood is both a biological and legal status. By nature and by law, it confers rights and imposes duties. One of the most basic of these is the obligation of the parent to support the child until the law determines that he is able to care for himself. As it is the obligation of the parent to provide the support, so it is the right of the child to expect it . . .
>
> > The duty of parents to provide for the *maintenance* of their children is a principle of natural law; an obligation . . . laid on them not only by nature herself, but by their own proper act, in bringing them into the world . . . By begetting them, therefore, they have entered into a voluntary obligation . . . And thus the children have the perfect *right* of receiving maintenance from their parents.

*Id.* at 170, 577 A.2d 14 (quoting 1 W. Blackstone, *Commentaries* 447).

The civil paternity laws did not create in a child born out of wedlock the right to support and care from his biological parents. They merely established a means by which to enforce that right. Conversely, the civil paternity laws did not create in a child born out of wedlock a right to support and care from a non-biological "father." By amending F.L. § 5-1038(a) to permit a court to vacate an enrolled paternity declaration that was predicated on the subsequently disproven scientific fact of biological fatherhood, and thus incorrectly was premised on the adjudged father and the child occupying a relationship implicating a duty and correlative right to care and support, the General Assembly provided a means for the court to reassign the legal status of the parties to comport with their underlying legal rights. Likewise, the 1995 amendment to F.L. § 5-1006 permitted the court to immediately redetermine paternity, so to reassign the legal status of the child *vis a vis* his actual biological father, in any case in which the child is not yet eighteen.

### (ii)

 Danielle and the Bureau do not challenge the power of the Legislature to provide prospectively for the reopening of enrolled judgments of paternity based on subsequent blood or genetic tests. They argue, however, that retroactive application of the 1995 amendment to F.L. § 5-1038(a) to the 1989 paternity declaration would interfere with vested rights, and "would potentially affect the rights of thousands of parents and children." Aside from this statement, appellees do not identify what vested rights would be affected. We conclude that the General Assembly was empowered to enact legislation that would enable courts to vacate previously enrolled erroneous judgments of paternity and that retroactive operation of F.L. § 5-1038(a) does not impair a vested right that is immune from modification by the General Assembly.

The term vested rights has been used often by Maryland appellate courts but has not been defined in the context

relevant here. The Court of Appeals has not spoken on whether vested rights exist beyond those rights that receive constitutional protection (such as due process rights, property rights, or rights attendant upon the creation of contractual obligations), but it has treated the two concepts as equivalent. *See Riverdale Fire Co.*, 308 Md. at 569, 520 A.2d 1319 (stating that a construction of the Act in question in that case that would cut off accrued causes of action for compensatory damages but that would not interfere with rights "of constitutional magnitude" should "be avoided"); *Janda*, 237 Md. at 169, 205 A.2d 228 ("[T]he limitations on retroactive laws are only those which affect all legislation and, if the Legislature intends a law affecting substantive matters to operate retrospectively and the law does not offend constitutional limitations or restrictions, it will be given the effect intended."). Appellees do not suggest that their interest in a final judgment in this case is of constitutional magnitude. It is apparent in any event that the 1989 judgment does not touch upon contractual or property rights, and that no procedural or substantive due process right is implicated.

The support obligation that arises with paternity is a duty, not a debt. *See Middleton*, 329 Md. at 637, 620 A.2d 1363; *Corley*, 236 Md. at 243, 203 A.2d 697; *Zouck v. Zouck*, 204 Md. 285, 298, 104 A.2d 573 (1954). This duty is rooted in public policy, and may not be bargained away or waived. *Zouck*, 204 Md. at 300, 104 A.2d 573. Whereas proprietary interests may vest with certainty upon a final determination of a court with jurisdiction, the financial obligations of paternity are ongoing and subject to modification at any time. *See* F.L. § 5–1038(b); *Jessica G. v. Hector M.*, 337 Md. 388, 401, 653 A.2d 922 (1995). Thus, paternity adjudications serve to declare a filial relationship and give rise to filial duties, but do not determine contractual or proprietary rights in the manner of actions in tort or contract.

The civil action for a declaration of paternity, granted by statute and conferring no contract or proprietary rights, is readily modifiable by the Legislature. Rights that

are purely statutory in origin are "wiped out" when the statute is repealed, so long as vested rights are not otherwise disturbed. *Yorkdale Corp. v. Powell*, 237 Md. 121, 127, 205 A.2d 269 (1964); *Beechwood Coal Co. v. Lucas*, 215 Md. 248, 256, 137 A.2d 680 (1958). *Randall v. Kreiger*, 90 U.S. (23 Wall.) 137, 23 L.Ed. 124 (1875), provides an early discussion of this principle. In that case, in 1849, a married couple living in New York executed a power of attorney to effect the sale of real estate situated in the Territory of Minnesota. *Randall*, 90 U.S. at 146. In 1855, the property was sold. *Id.* When the power of attorney had been executed, there was no law in the Territory of Minnesota authorizing a husband and wife either to create or to convey property under such an instrument. In 1857, such a law was enacted. *Id.* The suit in *Randall* was brought by the widow, formerly a signatory to the power of attorney, seeking dower in the land from the purported owner based on an assertion that her power of attorney was of no effect under the law of Minnesota. *Id.*

 The Supreme Court considered the 1857 Act a curative statute that validated the prior power of attorney and sale. *Id.* at 149.[12] The Court concluded that the dower right asserted by the widow was "not a natural right," but a right "wholly given by law, and the power that gave it may increase, diminish or otherwise alter it or wholly take it away." *Id.* at 148. Of the widow's claim that retroactive application of the 1857 Act would violate vested property rights, the Court stated:

---

12. A curative act is one that is "passed to cure defects in prior law, or to validate legal proceedings, instruments, or acts of public and private administrative authorities which in the absence of such an act would be void for want of conformity with existing legal requirements, but which would have been valid if the statute had so provided at the time of enacting." *Berean Bible Chapel v. Ponzillo*, 28 Md.App. 596, 600–01, 346 A.2d 702 (1975)(quoting 2 *Sutherland, Statutes and Statutory Construction*, § 41.11 (4 th ed.1973)). Curative acts are usually characterized as being retrospective in operation, "on the theory that whatever a sovereign power may authorize in prospect, it may adopt and validate in retrospect, so long as there is no interference with vested rights or contractual obligations." *Dryfoos v. Hostetter*, 268 Md. 396, 404, 302 A.2d 28 (1973) (citations omitted).

[T]here can be no vested right to do wrong. Claims contrary to justice and equity cannot be regarded as of that character. Consent to remedy the wrong is to be presumed. The only right taken away is the right dishonestly to repudiate an honest contract or conveyance to the injury of the other party. Even where no remedy could be had in the courts the vested right is usually unattended with the slightest equity.

... The curative Act of 1857 has a strong natural equity at its root. It did for her what she attempted to do, intended to do, and doubtless believed she had done, and for doing which her husband was fully paid.

*Id.* at 149 (citation omitted). Similarly, in this case, the "right," if any, taken away by the reenactment of F.L. § 5–1038(a) is in actuality the right to repudiate a natural filial relationship by perpetuating an inaccurate legal declaration.

The Court of Appeals has stated that additional factors may be relevant to the vested rights analysis. In *Washington Nat'l Arena Ltd. Partnership v. Prince George's County*, 287 Md. 38, 410 A.2d 1060 (1980), the Court considered the effect of a retroactive tax law on constitutionally protected property rights. Taxpayers in Prince George's County had contested a law purporting to ratify a prior tax rate that exceeded the legal maximum rate in place when the tax was collected. *Washington Nat'l Arena*, 287 Md. at 43–44, 410 A.2d 1060. The Court drew a distinction between curative legislation employed to ratify defects in authority unrelated to underlying legislative policy and unconstitutional legislation that, under the guise of curing a defect, retroactively changes legislative policy. *Washington Nat'l Arena*, 287 Md. at 50, 410 A.2d 1060. Ultimately, the Court decided that the curative tax law at issue had impermissibly attempted to change the legislative policy in existence when the tax was collected. But the Court added the following direction:

We do not suggest that this distinction ... can always, like a mathematical formula, determine whether a purported "curative act" should be upheld. Other factors, such as whether the retrospective application of the statute works

substantial injustice, whether the retroactive act was antici-
pated at the time of the transaction, the nature of the
"colorable authority" under which the governmental officials
were acting, whether the defect in authority at the time of
the collections was inadvertent, whether or not the "repairs"
made by the ratification statute were "small," etc., all may
have a role.

*Id.* at 51, 410 A.2d 1060 (citing, *inter alia,* Charles B. Hoch-
man, *The Supreme Court and the Constitutionality of Retro-
active Legislation,* 73 Harv. L.Rev. 692, 703–06 (1960)).

Although *Washington Nat'l* involved curative legislation and
constitutionally protected property rights, an application of
the factors identified in that case to the statute at issue here,
to the extent they are relevant, reinforces our conclusion that
F.L. § 5–1038(a) should be given retroactive effect. First, it
is not substantially unjust to provide for more accurate deter-
minations of paternity and where possible to redirect child
support collection efforts toward biological fathers. Second,
since the inception of a cause of action under the paternity
subtitle, the stated purpose of the subtitle and the existence of
blood testing provisions have created an expectation that
actual biological fathers will be the subject of paternity decla-
rations. A legal result predicated upon a more accurate
assessment of actual paternity furthers this core expectation.
Finally, given the difficulty of foreseeing the advances in
genetic research that have occurred in the past decade, the
General Assembly's failure to address in the first instance the
issues raised in this case and in *Tandra S.* was understanda-
ble, and its subsequent amendment to F.L. § 5–1038(a) was
not major when viewed in light of the overall statutory scheme
of the paternity subtitle. The result we reach today thus
comports with these and other equitable considerations that
may be relevant to the identification of vested rights. *Cf.
Hochman, supra,* at 697 (citing three pertinent factors dis-
tilled from Supreme Court decisions on the constitutionality of
retroactive legislation: "[T]he nature and strength of the
public interest served by the statute, the extent to which the

statute modifies or abrogates the asserted preenactment right, and the nature of the right which the statute alters.").

Given that paternity declarations are creatures of statute and that the 1989 paternity declaration entered prior to the amendment to F.L. § 5–1038(a) did not confer contractual or proprietary rights, we conclude that, in considering the effect of the changes to F.L. § 5–1038(a) on vested rights, there is no reason to distinguish a retroactive application of that statute from a prospective application. This is not a case in which the lack of notice of the subsequent changes to F.L. § 5–1038(a) produced actions by the parties worthy of protection from legislative interference. There can be no vested interest in an erroneous legal declaration of paternity. We conclude therefore that if Tyrone is proven by blood or genetic testing not to be the biological father of T.R., appellees have no vested right in the 1989 paternity judgment.

### III. and IV.

#### *Blood or Genetic Testing*

We address Tyrone's last two questions together because they are interrelated.

#### (i)

Although not expressly stated in its memorandum opinion, the circuit court appears to have denied Tyrone's request for blood or genetic testing under F.L. § 5–1029 in part because it assumed that the 1995 amendment to F.L. § 5–1038(a) did not to apply to the 1989 paternity judgment in this case. For the reasons we have explained, that conclusion was legally incorrect. Had blood or genetic testing done in accordance with F.L. § 5–1029 excluded Tyrone as T.R.'s biological father, the circuit court would have been empowered under F.L. § 5–1038(a)(2)(i)(2) to vacate the 1989 paternity judgment. The results of the tests sought by Tyrone thus would have been highly relevant and material to the court's decision on his motion to vacate.

F.L. § 5–1029 provides, in pertinent part:

(b) *In general.*—On the motion of the Administration, a party to the proceeding, or on its own motion, the court shall order the mother, child, and alleged father to submit to blood or genetic tests to determine whether the alleged father can be excluded as being the father of the child.

\* \* \* \* \*

(f) *Laboratory report as evidence.*—(1) Subject to the provisions of paragraph (3) of this subsection, the laboratory report of the blood or genetic test shall be received in evidence if: (i) definite exclusion is established; or (ii) the testing is sufficiently extensive to exclude 97.3% of alleged fathers who are not biological fathers, and the statistical probability of the alleged father's paternity is at least 97.3%. (2) A laboratory report is prima facie evidence of the results of a blood or genetic test.

(3)(i) Subject to the provisions of subparagraph (ii) of this paragraph, the laboratory report of the blood or genetic test is admissible in evidence without the presence of a doctor or technician from the laboratory that prepared the report if the report: 1. is signed by the doctor or technician who prepared or verified the report; and 2. states that the result of the blood or genetic test is as stated in the report. (ii) When the laboratory report of the blood or genetic test is admitted in evidence, a doctor or technician from the laboratory that prepared the report is subject to cross-examination by any party to the proceeding if the party who desires cross-examination has subpoenaed the doctor or technician at least 10 days before trial.

(4) A laboratory report received into evidence establishing a statistical probability of the alleged father's paternity of at least 99.0% constitutes a rebuttable presumption of his paternity. . . .

In *Eagan v. Ayd, supra,* 313 Md. 265, 545 A.2d 55, the Court discussed the history behind the enactment in 1941 of Article 12, § 17 of the Maryland Code, which was the predecessor to F.L. § 5–1029. Section 17, which became law as part of the criminal bastardy statute, was nonetheless an

"innovation" that was "enacted in order to give the court the benefit of a relatively new scientific tool—the use of blood tests to prove nonpaternity." 313 Md. at 269, 545 A.2d 55. The new enactment provided:

> Whenever the defendant in bastardy proceedings denies that he is the father of the child, upon the petition of the defendant, the court shall order that the complainant, her child and the defendant submit to such blood tests as may be deemed necessary to determine whether or not the defendant can be excluded as being the father of the child. The result of the test shall be received in evidence, but only in case definite exclusion is established ... If the complainant or her child fail to submit to the blood tests ordered by the court to be taken, such fact, when properly adduced by evidence, shall be disclosed to the court and jury, and may be commented upon by the court or by counsel to the jury or to the court when sitting as a jury.

*Id.* at 270, 545 A.2d 55.

The Court in *Eagan* went on to explain that when, by 1963 Md. Laws, ch. 722, "criminal 'Bastardy' became civil 'Paternity,'" many of the substantive provisions of former Article 12 were carried over, including § 17, which became Article 16, § 66G. *Id.* at 271, 545 A.2d 55. The blood testing statute was amended at that time to permit the court to order blood testing on its own motion. *Id.* at 271, n. 4, 545 A.2d 55.

In 1982, Art. 16, § 66G was amended to allow any party to a paternity action to request a blood test and to make the test admissible into evidence not only if it excludes the defendant as the father but also if it excludes 97.3% of the alleged fathers who are not biological fathers and the statistical probability of the alleged father's paternity was at least 97.3%. 1982 Md. Laws, ch. 784. In 1984, the section was amended to "eliminate the court's discretion to reject a qualifying blood test" by requiring that a test meeting the standards set forth in the section "shall be received in evidence." 313 Md. at 273, 545 A.2d 55. 1984 Md. Laws, ch. 551.

The provisions of former Article 16 were transferred to the Family Law Article by 1984 Md. Laws, ch. 296. As we have discussed in Part II., *infra*, a 1994 amendment to § 5–1029 inserted "or genetic" after "blood" throughout the section. It also added what is now subsection (f)(4), which creates a rebuttable presumption of paternity when a blood or genetic test obtained pursuant to the section shows a 99% statistical probability of paternity of the alleged father. 1984 Md. Laws, ch. 113. Finally, in 1997, the section was amended to, *inter alia*, permit the Child Enforcement Administration to request the mother, child, and alleged father to submit to blood or genetic tests. 1997 Md. Laws, ch. 609.

The history of the blood (and subsequently genetic) testing statute shows that it first was enacted for the sole benefit of the defendant in bastardy proceedings. Upon the denial of paternity, the defendant was entitled to petition the court for a blood testing order, and the test results were admissible only to the extent that they exonerated him. The right to a blood test, along with other rights afforded to the defendant in those proceedings, such as the right not to answer the complaint, not to be compelled to testify, and to have no comment made on his failure to testify, were transported into the civil paternity statute in 1963. *See Eagan*, 313 Md. at 271–72, 545 A.2d 55. Since then, defendants in paternity actions have continued to be notified by the involved State's Attorney's Office that by law they have the right to blood or genetic testing. Indeed, the Court of Appeals has used the word "mandatory" in referring to the blood or genetic testing afforded by F.L. § 5–1029. *See, e.g., Turner v. Whisted*, 327 Md. 106, 110, 607 A.2d 935 (1992); *Eagan*, 313 Md. at 275, 545 A.2d 55.

██ In this case, Tyrone contends that, pursuant to the 1995 amendment to F.L. § 5–1038(a), an adjudged father, like an alleged father, is entitled to request and receive mandatory blood or genetic testing under F.L. § 5–1029, and that the circuit court therefore lacked discretion to deny his request for testing. Danielle and the Bureau disagree, contending that 1) the blood or genetic testing afforded by F.L. § 5–1029

is only available *before* an adjudication of paternity; and 2) that the right to blood testing may be waived, for all time, prior to adjudication and that the circuit court in this case properly found that it was so waived. With respect to their first point, appellees argue that the focus of the language of subsection (f) on the use of blood or genetic testing results in *evidence* means that any such test results only may be used prior to a finding of paternity.

We note first that subsection (b) of F.L. § 5–1029 provides that upon motion by a party to the case, the court "shall order" the mother, child, and the alleged father to submit to blood or genetic tests, as further provided in the section. Ordinarily, unless the context otherwise indicates, the word "shall," except as used in its future sense, itself demonstrates a mandatory intent. *In re James S.*, 286 Md. 702, 708, 410 A.2d 586 (1980); *Maryland Medical Service, Inc. v. Carver*, 238 Md. 466, 479, 209 A.2d 582 (1964); *Barnes v. Pinkney*, 236 Md. 564, 574, 204 A.2d 787 (1964); *Dypski v. Bethlehem Steel Corp.*, 74 Md.App. 692, 698, 539 A.2d 1165 (1988). The connotation of the word "shall" in subsection (b) of F.L. § 5–1029 is obligatory, not permissive. Indeed, the word "shall" is used throughout F.L. § 5–1029 in its mandatory sense, with the word "may" being used when permissive action is implied, in explicit contrast to the word "shall." [13]

Moreover, as we have explained, the historical context of the enactment of what is now F.L. § 5–1029 indicates that with respect to the alleged father in a paternity action, the testing afforded by that section upon motion has been referred to and treated as mandatory. To be sure, the Court of Appeals in child custody cases and in cases brought under the Estates and Trusts Article has held that it is within the discretion of

---

**13.** For example, subsection (g) of F.L § 5–1029 provides:

Failure to submit to test.—If any individual fails to submit to a blood or genetic test ordered by the court, that refusal, properly introduced in evidence:

(1) *shall* be disclosed to the court; and

(2) *may* be commented on by counsel.

(Emphasis supplied).

the court to permit blood or genetic testing. *See Monroe v. Monroe*, 329 Md. 758, 621 A.2d 898 (1993)(holding that in domestic law custody case blood tests to determine paternity of child born out of wedlock may only be ordered upon a showing of good cause, under the "best interest of the child" standard); *Turner v. Whisted, supra*, 327 Md. 106, 607 A.2d 935 (holding that motion for blood tests filed in action premised on Md.Code (1974, 1991 Repl.Vol.), § 1–208 of the Estates and Trusts Article by male claiming to be biological father of child born to married couple is best analyzed as a request for a physical examination under Rule 2–423). Those cases have not involved the application of F.L. § 5–1029; rather, they have involved the application of Rule 2–423, which vests the circuit court with discretion to allow a party to an action, for good cause shown, to have a qualified examiner take the mental or physical examination of the opposing party. Furthermore, those cases have involved custody battles over the children at issue, in which the court's primary task was to ascertain what is in the best interest of the child, not to ascertain the scientific fact of paternity. We have not found any reported case in which the alleged father in a paternity action has been denied blood or genetic testing sought under F.L. § 5–1029.[14]

 We conclude from the language of F.L. § 5–1029 and the historical context of its enactment that upon the filing

---

**14.** In *Sider v. Sider*, 334 Md. 512, 639 A.2d 1076 (1994), the lower court consolidated a custody case between a divorcing husband and wife with a paternity action brought by the wife and by a man claiming to be the biological father of a child born to the wife during her marriage to the husband. The right to a blood test under F.L. § 5–1029 was not at issue because the man claiming to be the biological father and the mother and child voluntarily submitted to blood tests that established that man's biological paternity. In the paternity action, the mother twice filed motions under F.L. § 5–1029 seeking to have her husband submit to blood testing. The husband opposed the motions, and the circuit court denied them. On appeal to this Court, the mother argued that because she and the husband were parties to the paternity action, the court erred in denying her motions. In an unreported opinion, we held that even if the rulings were in error, the error was harmless because biological paternity was not in dispute. The Court of Appeals did not address that issue on certiorari. *Id.* at 521–22, 639 A.2d 1076.

of a motion with the court, an alleged father in a paternity action is entitled to an order directing the mother and child in the case to submit to blood or genetic testing. Because enactments are to be construed harmoniously, *see McCready Memorial Hosp. v. Hauser*, 330 Md. 497, 504–05, 624 A.2d 1249 (1993); *Dep't of Natural Resources v. France*, 277 Md. 432, 462–63, 357 A.2d 78 (1976), we further conclude that by amending F.L. § 5–1038(a) as it did in 1995, the Legislature intended that blood or genetic testing under F.L. § 5–1029 not only may be requested by an alleged father, and upon such request shall be ordered, *before* a declaration of paternity, but also may be requested by an adjudged father, and upon such request shall be ordered, *after* a declaration of paternity, upon a preliminary showing of good cause to believe that the requested tests will establish the necessary factual predicate for the court to exercise its revisory power under F.L. § 5–1038(a)(2)(i)(2). In this case, on the evidence adduced and the factual findings of the domestic relations master, Tyrone plainly satisfied the threshold good cause requirement.

With respect to the points argued by appellees, we note first that the provision of present F.L. § 5–1038(a)(2)(i)(2) permitting a court to modify or set aside an enrolled declaration of paternity if blood or genetic testing "done in accordance with § 5–1029 of this subtitle establishes the exclusion" of the adjudged father would be meaningless if the exclusionary testing pursuant to F.L. § 5–1029 that may serve as the basis for the court's exercise of its revisory power must have been requested and obtained prior to the declaration of paternity. Obviously, if blood or genetic testing excluding the alleged father had been obtained prior to the declaration of paternity, there would not have been a declaration of paternity at all and the adjudged father (who would not have become "adjudged") would not be invoking the revisory power of the court under F.L. § 5–1038(a). We reject as illogical appellees' position to the contrary.[15]

---

**15.** We note also that Tyrone's motion for blood or genetic testing was made by a "party to the proceedings," within the meaning of F.L. § 5–

██ Likewise, with respect to appellees' second point, we are persuaded that an alleged father's failure to move the court for blood or genetic testing prior to the declaration of paternity does not in and of itself constitute a waiver of his right to seek and obtain blood or genetic testing under F.L. § 5–1029 after a declaration of paternity. The cases resulting in a paternity judgment that is subject to challenge under F.L. § 5–1038(a) will be those in which the alleged father did not move for blood testing prior to the entry of judgment. Because every alleged father against whom a paternity action is filed is advised by the consenting State's Attorney's Office as a matter of course of the right to blood or genetic testing, it is axiomatic that, if the mere failure to request blood or genetic testing constitutes a waiver of the right to such testing for all time, there will be no circumstances under which the court might exercise its new revisory power under F.L. § 5–1038(a) and that the statutory amendment will have been purposeless.

██ We do not mean to suggest by our holding that in a given case facts could not exist, beyond the mere failure to move, that would constitute a waiver by an alleged or adjudged father of the right to obtain blood or genetic testing under F.L. § 5–1029. This case presented no such facts. The record does not reflect that Tyrone was represented by counsel when the Agreement was presented to him, when he signed it, when the paternity action was filed, or when the court issued its paternity declaration. The record does not reflect that Tyrone was provided any written advice by anyone concerning blood testing. The only evidence on this issue was Tyrone's testimony, before the domestic relations master, that a representative of the Talbot County State's Attorney's Office told him that he could have blood testing done "at that time." The trial court's factual finding, on that scant evidence, that Tyrone was represented by counsel and knowingly waived his right to seek blood testing then and always, was unsupported and clearly erroneous.

---

1029(b), in that there has been but one proceeding in this case: a paternity action.

## (ii)

As we have indicated, the circuit court also found as a fact that Tyrone failed to act with ordinary diligence in moving to vacate the 1989 judgment of paternity. Danielle and the Bureau contend that the court's finding in this respect was supported by the evidence and justified its denial of the motion to set aside the paternity declaration. We disagree.

The use of the word "may" in F.L. § 5–1038(a)(2)(i)(2) makes plain that a court's decision to modify or set aside an enrolled declaration of paternity on the basis of blood or genetic testing that reveals that the child's adjudged father is not his biological father is discretionary. The court's exercise of its revisory power on that basis, like its exercise of its revisory power on the basis of fraud, mistake, or irregularity, is an equitable consideration, and depends in part upon whether the party seeking relief exercised ordinary care to act diligently in requesting it.[16] In this case, however, the court's determination that Tyrone failed to exercise reasonable care in moving to set aside the paternity judgment was flawed in two respects.

First, by denying Tyrone the opportunity to obtain blood or genetic testing, the results of which could serve as the ground for modification or vacation of the paternity judgment, the court necessarily considered the equitable issue of ordinary diligence in isolation and out of context, without regard to the scientific evidence or to any other relevant evidence bearing on the equities of setting aside or letting stand the paternity judgment. Second, the court did not take evidence on which to base findings of fact relevant to the issue of ordinary diligence and to other equitable considerations. Moreover, to the extent that facts relevant to those issues were adduced before the domestic relations master and resulted in findings by her, the court rejected those findings without explanation,

---

**16.** Likewise, such a decision also includes consideration of the best interest of the child. *Sider v. Sider,* 334 Md. at 527, 639 A.2d 1076 (holding that " 'best interest of the child' standard should be used in deciding whether to grant a paternity petition.").

even though they were supported by the record. *See Domingues v. Johnson*, 323 Md. 486, 490, 593 A.2d 1133 (1991); *Best v. Best*, 93 Md.App. 644, 650–51, 613 A.2d 1043 (1992); *Wenger v. Wenger*, 42 Md.App. 596, 602, 402 A.2d 94 (1979).

The master found on the evidence presented that Tyrone had no reason to think that he was not T.R.'s biological father until, having just learned that Danielle had been involved with James P. when T.R. was conceived and having just discovered that T.R. resembled James P., he called and confronted T.R.'s mother, and she qualified her assertion of paternity with the word "if." The evidence showed that that confrontation occurred at least seven years after the paternity judgment was enrolled, and perhaps later. In its memorandum opinion, the court made no mention of those facts, stating only that "by waiting over nine years after a final judgment was entered" before filing his motion, Tyrone had not acted with ordinary diligence. The length of time between the enrollment of the judgment and the filing of a motion to vacate is not *per se* evidence of failure to act diligently in moving for relief from a judgment, without evidence that the party seeking the relief knew about the basis for seeking it during that time. *See Denton Nat'l Bank v. Lynch*, 155 Md. 333, 339, 142 A. 103 (1928)("what length of delay is fatal, or what laches will be deemed sufficient to justify the denial of the motion to strike out [an enrolled judgment], depends a great deal upon the facts and circumstances of each case.")

## CONCLUSION

For the reasons we have explained, we shall vacate the lower court's order denying Tyrone's motion for blood or genetic testing and denying his motion to set aside the 1989 paternity judgment, and remand the case with instructions to the lower court to order Tyrone, Danielle, and T.R. to submit to blood or genetic testing, pursuant to F.L. § 5–1029. If the results of the tests that are performed exclude Tyrone as the biological father of T.R., the court shall consider, in light of that evidence and in light of the evidence that has been

adduced thus far and that may be adduced upon a further evidentiary hearing, whether, in its discretion, the 1989 paternity declaration respecting T.R. should be set aside.[17]

**JUDGMENT VACATED EXCEPT WITH RESPECT TO CHILD SUPPORT; CASE REMANDED TO THE CIRCUIT COURT FOR TALBOT COUNTY FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION.**

**COSTS TO BE PAID BY APPELLEES.**

---

**17.** We note that a decision by a circuit court to vacate or modify an enrolled paternity judgment does not open up the possibility of recovery of past child support paid by the previously adjudicated father. *See Rand v. Rand,* 40 Md.App. 550, 555, 392 A.2d 1149 (1978).