798 A.2d 1149

**Patrick MURPHY,**

v.

**STEELE SOFTWARE SYSTEMS CORP.**

No. 2872, Sept. Term, 2000.

Court of Special Appeals of Maryland.

May 30, 2002.

Louis E. Grenzer, Jr. (Bodie, Nagle, Dolina, Smith & Hobbs, P.A., on the brief), Towson, for appellant.

Ronald J. Drescher (Drescher & Associates, P.A., on the brief), Baltimore, for appellee.

Argued before KENNEY, SHARER and CHARLES E. MOYLAN, JR. (Retired, Specially Assigned), JJ.

SHARER, J.

Steele Software Systems Corporation ("3S"), appellee, and Patrick Murphy, appellant, entered into a written employment agreement pursuant to which 3S engaged Murphy to supervise 3S's appraisal division. Soon after appellant's employment began it became clear that the relationship was not mutually satisfactory and degenerated into a classic "you're fired"/"I quit" scenario.

As a consequence of the end of the employer-employee status of the parties, Murphy filed a three count complaint in the Circuit Court for Baltimore City seeking damages for breach of contract, wrongful discharge, and intentional infliction of emotional distress. 3S answered and filed a counterclaim alleging breach of contract and attempted conspiracy to commit fraud.

The circuit court granted summary judgment in favor of 3S, from which this appeal is taken. The circuit court did not dispose of 3S's counterclaim, but entered a final judgment pursuant to Maryland Rule 2–602(b)(1). Additional factual and procedural background will be included in our discussion as necessary.

Appellant presents three issues, with sub-parts, for our review, which we restate more concisely as:

Did the trial court err as a matter of law in granting summary judgment?

To appellant's issue we add the following, *sua sponte:*

Did the trial court abuse its discretion in the entry of final judgment pursuant to Maryland Rule 2–602(b)?

We answer the latter question in the affirmative because we conclude that the utilization of Rule 2–602(b) in the context of the facts of this case was an abuse of discretion. Hence, we shall dismiss the appeal.

## FACTUAL BACKGROUND

As we have noted, Murphy became a contract employee of 3S under the terms of a contract of employment dated May 10, 1999 ("the original contract") and an "Addendum to Original Agreement" ("the addendum"), inexplicably dated May 5, 1999, five days earlier. Negotiations leading to the employment of Murphy by 3S were apparently conducted personally by Scott R. Steele, president of 3S ("Steele"). The record does not reveal the date upon which Murphy assumed his duties as a 3S employee, but we do know that, despite threats of resignation early on in his tenure, he finally left the employ of 3S on September 7, 1999.

The addendum was separately negotiated by Steele and Murphy, detailing certain aspects of Murphy's job requirements, including:

7. Duties:

The Employee's duties shall be the following.

. . .

c. Perform whatever duties 3S requests in the normal course of operating its business, participate in management team

d. PM [Murphy] will attend trade shows, sales presentations, business meetings as requested

e. Hours shall be a minimum of 10 hours net a day on average, up to 2 Saturdays a month if needed, from 9am–2pm.

At the conclusion of the addendum is the following provision, in capital letters: "ANY NON–PERFORMANCE OF THIS AGREEMENT UNDER SECTION 6 OR 7 OFF [sic] THIS ADDENDUM ARE REASONS FOR IMMEDIATE TERMINATION OF THE EMPLOYEE."

According to Steele, the employment relationship between 3S and Murphy failed to be mutually satisfactory from its inception. In fact, on June 7, 1999, Murphy submitted a letter of resignation to Steele. Notwithstanding his "resignation," Murphy remained employed by 3S until September 7, 1999.

According to Murphy, his disillusionment with 3S arose when he discovered that 3S management personnel were involved in what he characterized as "an airline ticket scam" to obtain cheaper airfares.[1] On September 2, 1999, Murphy informed Steele that he refused to participate in such activities, believing them to be "fraudulent and illegal."

On September 7, 1999, Murphy's 3S supervisors met with Murphy and told him that his performance was not satisfactory. He was advised that he had thirty days to bring his performance up to 3S standards and to comply with the contractual obligations as set forth in the addendum. Failure to improve, he was told, would result in termination. On the same day, and following that meeting, Murphy sent a letter to Carl Gent, an officer of 3S, stating that his performance to date had been "... as good as it gets."[2] Upon receipt of

---

1. Murphy alleges that he observed, on three occasions, representatives of 3S order tickets for identical flights exactly four weeks hence from the flight that they intended to take and, at the same time, book reservations on the earlier flight. When other passengers did not arrive at the gate for the earlier flight, they would show their tickets for the later flight and be allowed to board. According to Murphy, the purpose of this "scam" was to obtain cheaper fares. Steele responds that the ticketing method is legitimate and accepted in the business community.

2. The letter stated:
   Dear Carl:
   I have just come from a meeting with yourself and was advised that I have "30 days to prove to Scott Steele that I want this job, or I will be fired". [sic].
   Let me begin by relating to you that my performance while at this employ I have been performing duties that have been above and beyond anything that was explained to me prior to my employment here.
   Therefore, I am advising you in this letter that my performance here is as good as it gets.
   There will be no change forthcoming from myself. I will show up each day for work at 9 a.m. and stay until 7 p.m.

Murphy's letter, Gent promptly responded with a memorandum to Murphy dated September 7, 1999, specifying the deficiencies in his performance. Gent advised Murphy that 1) Murphy's time commitment was not up to 3S standards; 2) Murphy left soft copies of work product unreviewed prior to leaving for the day; 3) Murphy walked out on a new customer conference call; 4) customers had complained about Murphy's refusal to take telephone calls and about his having a bad attitude; and 5) Murphy had made false representations to Steele concerning his job performance. After receiving Gent's memorandum, Murphy left the 3S business premises and did not return.

## PROCEDURAL HISTORY

On November 5, 1999, Murphy filed a complaint against 3S in the Circuit Court for Baltimore City, seeking damages for breach of contract, wrongful discharge, and intentional infliction of emotional distress arising out of the brief employment relationship.

On January 5, 2000, 3S filed a motion to dismiss or, in the alternative, for summary judgment. The motion was supported by an affidavit of Steele. Murphy filed a timely response to 3S's motions and also filed an amended complaint, which added several factual allegations but did not state new claims. On January 24, 2000, the circuit court entered an order denying 3S's motion. Subsequently, on January 28, 2000, 3S filed a counterclaim against Murphy alleging breach of contract and attempted conspiracy to commit fraud, to which Murphy filed a timely answer.

On November 30, 2000, 3S filed a second motion for summary judgment, also supported by affidavits and exhibits.

---

I will ensure that appraisal reports that come through this department for review are of a quality that our clients expect.
In conclusion, I hope that Mr. Steele can come to his senses long before 30 days have passed.
Sincerely,
Patrick Murphy

The exhibits included the original employment agreement; the addendum to the original agreement; a copy of the June 7, 1999 letter of resignation from Murphy to Steele; the September 7, 1999 letter from Murphy to Gent; the September 7, 1999 response letter from Gent to Murphy; a "request for verification of employment" form for a mortgage application; Murphy's time sheets; a deposition taken of Murphy; a deposition taken of James Hampson, a travel agent who booked air travel arrangements for 3S, regarding the airline ticket purchases; and an affidavit of Steele. Murphy filed a timely response to the motion, but failed to support the response with an affidavit or other written statement under oath.[3]

The various motions came on for hearing before the circuit court on January 22, 2001. During that hearing the trial judge noted that Murphy, by not having filed a supporting affidavit or statement, failed to comply with Rule 2-501(b). At the request of Murphy's counsel, the court agreed to hold the matter open until the following day to give counsel the opportunity to prepare and file an affidavit.

On January 24, 2001 (one day after the court's deadline), counsel for Murphy submitted an affidavit, by Murphy, rebutting the assertions of the 3S motions. 3S moved to strike Murphy's affidavit as being untimely. The court granted 3S's motion to strike, noting on the order, by interlineation, that "I have reconsidered my decision with respect to the late submission of the affidavit and agree with the position of the defendant [3S]." The court then entered an order granting sum-

---

3. Maryland Rule 2-501(b) provides that:

The response to a motion for summary judgment shall identify with particularity the material facts that are disputed. When a motion for summary judgment is supported by an affidavit or other statement under oath, *an opposing party who desires to controvert any fact contained in it may not rest solely upon allegations contained in the pleadings, but shall support the response by an affidavit or other written statement under oath.*

(Emphasis added).

mary judgment in favor of 3S as to all counts in Murphy's amended complaint.

Murphy moved for reconsideration of the order granting summary judgment, and 3S filed a timely opposition. On February 14, 2001, before the trial court had ruled on the motion for reconsideration, the parties submitted a joint stipulation to stay the proceedings (including 3S's counterclaim) so that Murphy could file an appeal of the trial court's order granting summary judgment. On February 23, 2001, the trial court, finding that there was no just cause for delay, entered an order of final judgment pursuant to Maryland Rule 2–602(b). Murphy then noted this appeal.

## DISCUSSION

### *Did the trial court abuse its discretion in the entry of final judgment pursuant to Maryland Rule 2–602(b)?*

We answer the question in the affirmative and turn our attention to Maryland Rule 2–602.

Maryland Rule 2–602 provides as follows:

(a) **Generally.** Except as provided in section (b) of this rule, an order or other form of decision, however designated, that adjudicates fewer than all of the claims in an action (whether raised by original claim, counterclaim, cross-claim, or third-party claim), or that adjudicates less than an entire claim, or that adjudicates the rights and liabilities of fewer than all the parties to the action:

(1) is not a final judgment;

(2) does not terminate the action as to any of the claims or any of the parties; and

(3) is subject to revision at any time before the entry of a judgment that adjudicates all of the claims by and against all of the parties.

(b) **When allowed.** If the court expressly determines in a written order that there is no just reason for delay, it may direct in the order the entry of a final judgment:

(1) as to one or more but fewer than all of the claims or parties; or

(2) pursuant to Rule 2–501(e)(3), for some but less than all of the amount requested in a claim seeking money relief only.

It is clear that the trial court's grant of summary judgment served to adjudicate fewer than all of the rights and liabilities of all of the parties because the 3S counterclaim remains unresolved. The issue being the propriety of the entry of the order of final judgment, we will direct our discussion to subsection (b)(1) of the rule.

At oral argument we raised the issue of the propriety of the Rule 2–602 certification and our jurisdiction. In response, counsel suggested that our determination of the correctness of the circuit court's grant of summary judgment would promote judicial economy for that court. Of course, this Court and the Court of Appeals have often said that the judicial economy to be attained under the rule is to benefit the appellate courts. See, e.g., *Tharp v. Disabled Am. Veterans Dep't of Md., Inc.*, 121 Md.App. 548, 566, 710 A.2d 378 (1998) (explaining that "Rule 2–602 seeks economy from the perspective of the appellate court, not from the perspective of the trial court"). The jurisdiction of this Court may not be conferred by consent of the parties. *Huber v. Nationwide Mut. Ins. Co.*, 347 Md. 415, 419, 701 A.2d 415 (1997) (citing *Biro v. Schombert*, 285 Md. 290, 293, 402 A.2d 71 (1979)); *Tharp*, 121 Md.App. at 557, 710 A.2d 378. It is our duty, in appropriate cases, to raise, and decide, issues of our jurisdiction over cases appealed to this Court. *Harford Sands, Inc. v. Levitt & Sons, Inc.*, 27 Md.App. 702, 343 A.2d 544 (1975).

Therefore, we must consider the application of Rule 2–602 in the present case and determine the propriety of the certification made at the joint request of, and with the consent of, the parties.

As we noted in *Russell v. American Security Bank*, 65 Md.App. 199, 202, 499 A.2d 1320 (1985) (citations omitted), the

policy of Rule 2–602 is to promote judicial economy by avoiding "... piecemeal appeals by providing that only [when the] trial court has fully adjudicated all issues in a case will an appeal be permitted." *See also* P. Neimeyer & L. Schuett, *Maryland Rules Commentary* at 452 (2d ed.1992).

■■■■ To justify the entry of an order under Rule 2–602(b)(1) the trial court must expressly determine, and articulate for the record in a written order, that there is no just reason for delay of the appeal. *Tyrone W. v. Danielle R.*, 129 Md.App. 260, 270, 741 A.2d 553 (1999). The certification permitted by Rule 2–602 "... should be used sparingly so that piecemeal appeals and duplication of efforts and costs in cases involving multiple claims or multiple parties may be avoided...." *Maryland–Nat'l Capital Park & Planning Comm'n v. Smith, et vir,* 333 Md. 3, 7, 633 A.2d 855 (1993). The certification process is to be reserved for "the infrequent harsh case." *Allstate Ins. Co. v. Angeletti,* 71 Md.App. 210, 218, 524 A.2d 798 (1987) (quoting *Panichella v. Pennsylvania R.R. Co.,* 252 F.2d. 452, 455 (3d Cir.1958), *cert. denied,* 361 U.S. 932, 80 S.Ct. 370, 4 L.Ed.2d 353 (1960)). A common factor in the cases in which piecemeal certification has been permitted is the potential that delay of the appeal may work an economic hardship upon one or more of the parties. *Canterbury Riding Condominium v. Chesapeake Investors, Inc.,* 66 Md.App. 635, 652, 505 A.2d 858 (1986) (citing *Curtiss–Wright Corp. v. General Elec. Co.,* 446 U.S. 1, 100 S.Ct. 1460, 64 L.Ed.2d 1 (1980)). Whether the case involves multiple parties or multiple claims, the criteria for application of the rule are the same. *Planning Board of Howard County, et al, v. Mortimer, et al,* 310 Md. 639, 530 A.2d 1237 (1987).

Moreover, successful application of the certification process requires that the trial court "... expressly determine[s] in a written order that there is no just reason for delay...." Md. Rule 2–602(b). In *Canterbury,* we noted, with approval, the language of *Allis–Chalmers Corp. v. Philadelphia Elec. Co.,* 521 F.2d 360, 364 (3d Cir.1975) (quoting *Protective Comm. v.*

*Anderson,* 390 U.S. 414, 434, 88 S.Ct. 1157, 20 L.Ed.2d 1 (1968)) that

> [a] proper exercise of discretion under [the rule] requires the [trial] court to do more than just recite the . . . formula of "no just reason for delay." The court should clearly articulate the reasons and factors underlying its decision to grant . . . certification. "It is essential . . . that a reviewing court have some basis for distinguishing between well-reasoned conclusions arrived at after a comprehensive consideration of all relevant factors, and mere boiler-plate approval phrased in appropriate language but unsupported by evaluation of the facts or analysis of the law. . . ."

Writing for this Court in *Canterbury,* Judge Moylan noted that,

> [a]lthough we stop short of adding any rigid requirement or "precise rubric" when a trial judge certifies a case as final under Rule 2–602, we nonetheless find it more difficult to affirm the exercise of discretion where no reasons for that exercise are given. Here, the judge did not give us the benefit of [the] reasoning process. Here, moreover, we do not even have the benefit of an articulated argument, oral or written, from the appellant as it moved for certification. . . . We are left to speculate as to what the countervailing considerations might be.

*Canterbury,* 66 Md.App. at 651, 505 A.2d 858.

We find ourselves in the same posture. Here, the joint motion for certification suggests no more than a benefit to the parties and potential judicial economy to the trial court. The order of certification was signed, *pro forma,* without hearing and without articulation of a comprehensive consideration of all relevant factors. We are unable to discern the existence of "no just reason for delay." In *Anthony Plumbing of Maryland, Inc. v. Attorney General,* 298 Md. 11, 16, 467 A.2d 504 (1983), the Court of Appeals said that "appellate jurisdiction cannot be conferred on a reviewing court by consent of the litigants . . . [hence] this Court will dismiss an appeal *sua*

*sponte* when it recognizes that appellate jurisdiction is lacking." We shall do likewise.

Because we dismiss the appeal, we need not consider the other questions.

**APPEAL DISMISSED.**

**COSTS TO BE PAID BY APPELLANTS.**